Howarth et ux., Appellants, *v.* Gilman et al.

Argued November 15, 1949; reargued January 12, 1950. Before MAXEY, C. J., DREW, LINN, STERN, STEARNE and JONES, JJ.

52

*Thomas Raeburn White,* with him *C. Laurence Cushmore, Jr.* and *White, Williams & Scott,* for appellants.

*Robert K. Greenfield,* with him *Thomas F. Devine* and *Sundheim, Folz, Kamsler & Goodis,* for appellees.

*Elmer T. Bolla,* Deputy Attorney General, with him *T. McKeen Chidsey,* Attorney General, for Commonwealth, intervening appellee.

*John Y. Scott,* for Pennsylvania Society of Professional Engineers, amicus curiæ.

OPINION BY MR. CHIEF JUSTICE DREW, May 22, 1950:

This action in assumpsit was brought by John A. Howarth and Jennifer Howarth, trading as Howarth and Company, to recover from George H. Gilman, Martin Gilman and Alexander Brown, trading as Gilman Manufacturing Company, the sum of $1,733.13, allegedly due under two oral contracts in accordance with which Howarth and Company prepared plans and drawings for a clothes hamper and rendered engineering advice concerning the manufacture and production of wardrobe cabinets. Gilman Manufacturing Company, defendants, denied the execution of these contracts but a jury rendered a verdict for plaintiffs for $1,200.00. Defendants' motion for judgment n. o. v. was dismissed and judgment entered on the verdict. The Superior Court reversed the judgment of the lower court and this Court, upon petition, allowed this appeal.

A short time prior to March 30, 1946, plaintiffs, who are industrial designers, prepared for defendants at their request a set of plans to be followed in the manufacturing of waste baskets and metal clothes hampers and for these services plaintiffs were fully paid. On March 30th the parties met for the first time to discuss the feasibility of further altering the style of the metal

hampers and of designing tools and dies necessary for their production. After several such conferences it was agreed that plaintiffs should proceed with this work and upon its completion would receive the fair and reasonable value of their services. In May, 1946, defendants requested that plaintiffs visit their plant and inspect certain machinery and process there and give engineering advice with regard to operations, particularly spot welding and power braking, for the production of a double door wardrobe cabinet. By the end of May, 1946, plaintiffs had completed their inspection of defendants' plant and from their studies made recommendations of improvements to be effected. The preparation of the new designs requested by defendants, however, continued for several more months and were not completed until September 3, 1946, on which date they were tendered to defendants. They refused to accept the designs or to pay as agreed whereupon this action followed.

Defendants argued in the Superior Court, and again here, that, contrary to the law of this Commonwealth, plaintiffs held themselves out as an engineering firm and performed engineering services at a time when they were not licensed engineers and therefore cannot now recover the sums due under the contracts. That the courts will not lend their aid to enforcement of unlawful contracts which are founded upon transactions in violation of a public policy declared by the legislature is unquestionably true. *F. F. Bollinger Co. v. Widmann B. Corp.,* 339 Pa. 289, 14 A. 2d 81. The Superior Court found as a matter of law that plaintiffs were engaged in the practice of engineering contrary to the "Professional Engineers Registration Law" of May 23, 1945, P. L. 913, and that they therefor could not recover. This finding was based on the correspondence between the parties offered in evidence, the averments in the statement of claim and an examination of the numerous highly tech-

nical and intricate exhibits and drawings prepared by plaintiffs which the court concluded revealed "that engineering knowledge was required and employed." This conclusion was amply supported by the evidence and was not controverted here. Instead, when this case was first heard by this Court, plaintiffs argued that Section 2 of the Act of 1945, supra, defining the "practice of engineering", was so vague and indefinite as to be unconstitutional. On reargument, however, it was noted that this Act did not go into effect until June 30, 1946, and that, at the time the negotiations first were entered into, the Act of May 6, 1927, P. L. 820, as amended[1] was still in force. Plaintiffs thereupon submitted a brief urging that the Act of 1927, supra, was equally unconstitutional. Although the definition contained in the two acts differs only in that the one in the 1945 Act is more explicit, our decision must be limited to the Act governing the contracts of these parties. We must therefore determine, at the outset, when these contracts came into existence.

The contract to inspect the plant of defendants and make suggestions as to improvements in the production line was obviously controlled by the Act of 1927, supra, since all that was to be done in accordance with that contract was done before the end of May, 1946. Although the work on the designing of the new hampers continued until September, 1946, it is quite apparent from the evidence considered in the light of the verdict that an agreement was reached as to the terms of the contract in May, 1946. The Act of 1927, supra, controlled the effect of the contracts and it is the constitutionality of that Act that must now be determined.

---

[1] The Act of May 23, 1945, P. L. 923 amended sections two and four of the Act of 1927. These amendments were passed on the same day as P. L. 913 of 1945, which repealed the Act of 1927 but did not go into effect until June 30, 1946, and apparently were intended as interim provisions until similar sections in P. L. 913 became effective.

In attacking the Act, plaintiffs argue that the definition of "practice of engineering" contained in Section 2 is so vague that it is not possible to determine what activities are within the prohibition expressed in Section 1.[2] It is true that where a statute is so vague, indefinite and uncertain that the courts are unable to determine, with any reasonable degree of certainty, what the legislature intended, it will be declared inoperative, but ". . . An act will not be declared inoperative and ineffectual on the ground that it furnishes no adequate means to secure the purpose for which it is passed, if common sense and reason can devise and provide the means, and all the instrumentalities necessary for its execution are within the reach of those intrusted therewith": *Miller v. Belmont P. & Rubber Co.,* 268 Pa. 51, 63, 110 A. 802; *Commonwealth v. Moir,* 199 Pa. 534, 544, 49 A. 351.

The Act of 1927, as amended, supra, describes the "practice of engineering" in Section 2 as: ". . . the practice of civil engineering, mechanical engineering, electrical engineering, mining engineering, chemical engineering, surveying, or any constituent part or parts of these, or combinations thereof, such as architectural engineering, ceramic engineering, industrial engineering, metallurgical engineering, petroleum and natural gas engineering, sanitary engineering, and structural engineering, the pursuit of any of which affect life, health, or property, or the public welfare. Said practice also includes the doing of such architectural work as is

[2] Section 1 provides: "In order to safeguard life, health, and property, any person practicing, or offering to practice, the profession of engineering in any of its branches, including surveying, shall hereafter be required to submit evidence that he or she is qualified so to practice, and shall be registered as hereinafter provided; and it shall be unlawful for any person to practice, or to offer to practice, the profession of engineering, in any of its branches, including surveying, in this Commonwealth, unless such person has been duly registered or exempted under the provisions of this act."

incidental to the practice of engineering." The legislature has thus defined the practice of engineering in terms of five major classifications and set forth as examples of constituent parts or combinations thereof, eight specific branches or species of engineering. By so doing it has drawn up a definition which is broad enough to subject the entire field of engineering to regulation but is, nevertheless, susceptible of a sufficiently precise interpretation, when read in the light of the purpose of the act and in conjunction with its other sections, to enable one to readily determine whether his activities are within the scope of the prohibition contained in Section 1. A more specific definition is improbable for it is clearly beyond the practical capabilities of any regulatory legislation to define the practice of engineering by attempting to enumerate the many and varied types of engineering that now exist and might possibly exist in the future and such a definition must, of necessity, make use of somewhat general terms.

The Act of 1927, supra, has headnoted as its purpose the regulation of the practice of the profession of engineering and this has been reiterated in Section 1 where the prohibition against practice without a license has been confined to the practice of the profession of engineering. It follows that, in interpreting the definition in Section 2, the words "civil engineering", "mechanical engineering", etc., must be read as the "profession of civil engineering", "profession of mechanical engineering", etc. The result is a distinguishing of the type of engineering work which the legislature sought to regulate and that work of an engineering nature performed by technicians or artisans who are commonly designated skilled laborers. For the word "profession" connotes something more than mere skill in the performance of a task. It has been defined by the courts in numerous opinions, the most comprehensive of which

may be found in *U. S. v. Laws,* 163 U. S. 258,[3] and in Webster's New International Dictionary as: "The occupation, if not purely commercial, mechanical, agricultural, or the like, to which one devotes oneself; a calling in which one professes to have acquired some special knowledge used by way either of instructing, guiding, or advising others or of serving them in some art". Although it is evident that an exactingly accurate definition of the word "profession" which will preclude the possibility of any controversy, is impossible, whatever uncertainty may be said to arise from the proper interpretation, as demonstrated above, of the words contained in Section 2 is the result of the definitive limitations of our language and is therefore not unreasonable. It is settled law that legislation will not be held invalid on the ground of uncertainty, if susceptible of any reasonable construction that will support and give it effect. *Miller v. Belmont P. & Rubber Co.,* supra; *Commonwealth ex rel. Greevy v. Reifsteck,* 271 Pa. 441, 115 A. 130. We therefore dismiss the contention of plaintiff that the definition contained in Section 2 is so vague as to render the Act inoperative and sustain its validity.

---

[3] "One definition of a profession is an 'employment, especially an employment requiring a learned education, as those of divinity, law and physic.' (Worcester's Dictionary, title profession.) In the Century Dictionary the definition of the word 'profession' is given, among others, as 'A vocation in which a professed knowledge of some department of science or learning is used by its practical application to the affairs of others, either in advising, guiding, or teaching them, or in serving their interests or welfare in the practice of an art founded on it. Formerly, theology, law, and medicine were specifically known as the professions; but as the applications of science and learning are extended to other departments of affairs, other vocations also receive the name. The word implies professed attainments in special knowledge as distinguished from mere skill. A practical dealing with affairs as distinguished from mere study or investigation; and an application of such knowledge to uses for others as a vocation, as distinguished from its pursuit for its own purposes.' "

Plaintiffs further insist that the Act of 1927 controls surveying as a profession distinct from that of engineering and therefore contains two subjects, contrary to our Constitution. They call our attention to *Commonwealth ex rel. v. Humphrey et al.*, 288 Pa. 280, 136 A. 213, in which this Court pointed out that the Engineers Licensing Act of May 25, 1921, P. L. 1131, might be unconstitutional because it distinguished the subjects "professional engineer" and "surveyor" and nevertheless attempted to regulate both in the same act. However the Court in that case also said at page 291: "Had the legislature made the definition of engineer broad enough to include a land surveyor, as engaged in a minor branch of engineering, —and this, perhaps, it might have done, — there would have been no necessity for subsequently defining a land surveyor . . . In short, the act in many ways, only some of which are here pointed out, deliberately treats a land surveyor as separate and distinct from what it calls a 'professional engineer,' rather than as one following a minor branch of engineering." In the 1927 Act, supra, the legislature complied with the suggestion contained in the above language by including "surveying" in the definition of "practice of engineering" and describing it throughout the act as a branch of engineering, thereby saving it from the fatal error complained of in the earlier act. Plaintiffs' last contention must therefore be dismissed.

Since the 1927 Act, supra, is constitutional, plaintiffs have, by engaging in the practice of engineering without registering in compliance with the Act, precluded themselves from recovery of the sums due under their contracts with defendants: *F. F. Bollinger Co. v. Widmann B. Corp.*, supra.

Judgment affirmed.