## Bellhy v. City of Washington

*Frank C. Carroll* and *Robert L. Ceisler*, for plaintiffs.

*Jerome Hahn*, for defendants.

CURRAN, J., January 5, 1967.—By amendment of December 1, 1965, No. 373, P. L. 1006, sec. 1, to The Third Class City Code, effective January 1, 1966, the legislature has mandated minimum annual salaries for members of the police department and the fire department. This was done by reenacting and amending sections 2001 (Police Bureau) and 2101 (Fire Bureau) of The Third Class City Code of June 23, 1931, P. L. 932, 53 PS §§37001 and 37102. The operative words in both these sections are similar, so this court will confine its review to section 2001, and the decision on it will necessarily apply to section 2101 as well. Section 2001, as amended, reads in its first part: "The minimum annual starting salary or compensation to be paid the members of the police force by any city shall be four thousand five hundred dollars ($4,500), with minimum annual increments of three hundred dollars ($300) for the *first* three years of such employment". (Italics supplied.) Thus, a policeman first coming on the force January 1, 1966, must be paid an annual salary of no less than $4,500 for that year, and if he stayed on the force through 1969, he would have by then accumulated three annual increments of at least $300 each, so that for the year 1969 he could not be paid an annual salary of less than $5,400. Plaintiffs contend that each policeman and fireman for the year 1966 would be entitled to a sal-

ary of $4,500 plus a yearly increment of $300, accruable for each of the first three years he had been on the force prior to January 1, 1966. Defendants contend that the first annual increment thus provided could not have been earned prior to the end of the year 1966. It is noticeable that the act nowhere refers to a cost-of-living increase, but instead uses only the term "increment". Should it not, therefore, follow that the legislature intended rewarding police officers on the basis of their increased proficiency, attained by them as they served from year to year? The word increment itself means just this, for Webster defines it as: "(1) an increase, especially in quantity or value". In this respect, it is also noteworthy that the code under Pensions, section 4303, 53 PS §39303, which provides additional pension benefits for police officers who remain on the force after they are eligible for retirement, makes use of the phrase "service increment". By looking at these two words together, service and increment, we feel we are given a clue to the legislature's thought in selecting use of the word "increment". In the present case it is, we think, to provide a service-earned increment for each of the first three years that a police officer worked on the force, a reward for in-service training and experience. Had the legislature merely sought to give a cost-of-living increase to these employes, it could very easily have said so, and it could have provided a formula for its determination, viz., cost indexes, etc. But the act does not do this; it provides for minimum annual increments of $300 for the *first three years* of such employment. It is this court's belief that this is a two-phase salary provision, i.e., an annual salary of not less than $4,500 with yearly increments of not less than $300 for the *first three years* of such employment.

I am unable to discover in these sections the ambiguity found by some. For it is to be noticed that in

the first half of sections 2001 and 2101 the adjective *first* is used following the initial mention of the $300 annual increments; whereas, in the last part of these sections, the adjective there employed is *next*, so that the first part reads ". . . with minimum annual increments of three hundred dollars ($300) for the *first three years* of such employment", but in the second part the wording is "minimum annual increments of three hundred dollars ($300) for the *next three years* of such employment". It is imperative, the court believes, that we mark well that the second part of these sections, insofar as it applies to policemen or firemen already on the force, comes into play only in the event that any such employe on the effective date of this act was receiving an annual salary of less than $4,500. Therefore, as to the policemen and firemen of the City of Washington, the latter part of these sections could never come into effect, since all these employes were then earning more than $4,500 yearly. Despite this, it is, nevertheless, necessary that we analyze both parts of these sections as we try to arrive at our decision. Where the policemen or firemen are earning less than $4,500 annually on the effective date of the act (January 1, 1966), the legislature has said that their salary must be immediately raised to that figure and that in addition from that time on—for the *next three years* of such employment—they shall receive a minimum annual increment of $300. But in the first part of these sections, i.e., where the officers are already earning an annual salary of $4,500, the legislature has said that each is to receive a minimum annual increment of $300 for the first three years of such employment. What meaning can the word *first* have in this context if it does not mean the first three years the employe actually worked as a policeman or fireman? If the legislature had not intended distinction in the use of these two words, *first* and *next*, surely

only one of them would have been employed. We can only conclude that the legislature contemplated some specific modification when it chose to use both of these adjectives.

The conclusion thus seems inescapable that the legislature meant to provide for true service increments, and not merely annual salary supplements. Any other decision could bring about a most unfortunate and unfair result, and one which the legislature certainly did not have in mind. For surely it could not have been unaware of this possibility. Suppose on January 1, 1966, a third class city had three police officers, all of whom were veterans of 10 years' service and who were making at the time an annual salary of $4,500. Those men, even though their police skills had increased by 10 years' service on the force, would earn for the year 1966 exactly the same amount of money as would the rookie just starting. This could happen under defendants' contention. But can it be said logically that the present amendment does not apply to the veteran and that he would be entitled to no increments for the first three years that he has served on the force? We think not. Defendants think otherwise. We would only adopt defendants' view if the act itself precludes us from arriving at any other decision, and we do not think that it does. Our view is that the act expressly provides to the contrary.

The considerations of grade, rank, and pay in the organizational set-up of a city police bureau and fire bureau are matters of high importance to the efficient operation of the systems themselves. Their organizational requirements are quite similar to the army's table of organization. Sound considerations make it imperative that rank be given to those most proficient, for discretionary authority can be vested only in proportion to an officer's ability to exercise it properly. In all cases, grade and pay must be commen-

surate with the rank and the amount of responsibility assumed. Any violation of these principles would only result in chaos. Surely the legislature was cognizant of this. An officer in the army who has the duties of a colonel can hardly be expected to meet his responsibility while holding the rank of lieutenant. A first sergeant must carry that grade, lest his authority be hollow. Only dissension can result when a police officer or fireman with many years' service is asked to work for the same salary as a rookie. This would be followed almost necessarily by gross inefficiency in a service where efficiency must ever be the quest. I do not believe this was what the legislature contemplated. Nor do I believe that it proposed, with one faint wave of the legislative wand, to cast aside entirely and completely the time-tested and valid principle of longevity pay, always a staunch rampart of the police and fire bureaus. In services where devotion to cause and dedication to duty are so vital, we cannot believe that it could have been the purpose of this piece of legislation to drum out so radically this intrinsic principle of discipline.

I do not find ambiguity in these sections, but if, arguendo, we accept such premise, the resulting decision would be the same. For then we could turn to the Statutory Construction Act for interpretative assistance, and under it we would first come upon this admonition: ". . . one of the presumptions the Court may be guided by is (1) that the legislature does not intend a result that is absurd, impossible of execution, or unreasonable": Act of May 28, 1937, P. L. 1019, secs. 51 and 52, 46 PS§§551 and 552. In the case of Loudon v. H. W. Shaull & Sons, Inc., 140 Pa. Superior Ct. 106 (1940), at page 115, the court said that in construing a statute, it is the court's duty to try to ascertain the legislative intent, and when that is done, the court has performed its full duty. Marson

v. Philadelphia, 342 Pa. 369 (1941), holds that statutes are to be construed whenever reasonably possible so as to effectuate the intention of the legislature. See also United States Steel Company v. Allegheny County, 369 Pa. 423 (1952). In determining the meaning of a word in a statute, the primary object is to ascertain and give effect to the intention of the legislature. See also Howarth v. Gillman, 164 Pa. Superior Ct. 454, affirmed 365 Pa. 50 (1949). Surely in the present case, it was not the desire of the legislature, by disturbing the very organizational framework of the police and fire bureaus, to wreak havoc upon the orderly operation and control of these forces. Discipline among such employes is hardly less vital than it is in an army; the efficient operation of a police force is impossible without it. Yet, were we to accept defendant's contention, a well-regulated police department or fire department could well become a rarity indeed.

Defendants argue that the legislature has mandated expenses for the city without providing the means by which these expenses can be met. Valid though this agrument may be, it is in no manner novel. The entire Third Class City Code abounds with fiscal and administrative constraint." Unwise, perhaps, as this may be deemed by some, such compulsion exists, nevertheless, as part of our municipal law, municipalities being but creatures and agencies of the State. The court's task is to scrutinize for interpretation, not for sagacity.

We can find no cases at point, but when we turn to the Police Pension section of The Third Class City Code, we find there are many cases that set forth the doctrine of liberal construction in favor of the policemen, based, no doubt, on the desire to keep well trained officers on the force: Buynak v. Wilkes-Barre Police Pension Fund Association, 404 Pa. 491 (1961), con-

struing the pension act to apply to a city policeman who retired before the city passed its ordinance implementing the act. See Eisenberger v. Harrisburg Police Pension Commission, 400 Pa. 418 (1960) ; Appeal of Wallington, 105 Pitts. L. J. 345 (1957).

We cannot agree with this contention of defendants. We, therefore, hold that on January 1, 1966, every policeman and fireman who served on the force for one full year or two years or three years, prior to January 1, 1966, and who was on that date receiving an annual salary of not less than $4,500, is entitled to an annual increment of $300 or $600 or $900, depending upon the number of years each served prior to the effective date of this act (January 1, 1966) ; provided, however, that no such employe, due to the provisions of this act alone, shall be entitled to receive a salary in excess of $5,400.

Precisely, this legislation does not provide that every policeman and fireman is to receive $900 in total increments (depending on the number of years of service) to be added to the salary he was receiving on January 1, 1966, without regard to the maximum salary of $5,400—plaintiffs neither contend nor ask this. Only those earning exactly this $4,500 would actually be increased the full $900, and then only if they had been in the service for three years prior to January 1, 1966. Some would receive little, some perhaps a substantial part of $900. In the City of Washington, some would actually receive nothing, and the most that any could receive for the year 1966 would be $394—if they had at least two years on the service— since the lowest paid of all the policemen and firemen were already listed in the budget for 1966 at $5,006. All this legislation and our decision does is assure to the veteran policeman and fireman the same considerate treatment extended to the rookie. Accordingly, an order will be drawn to carry out this decision.

ORDER

And now, January 5, 1967, in accordance with the opinion filed herewith, it is ordered that judgment be entered for plaintiffs and that a writ of mandamus issue compelling defendants to pay to plaintiffs salaries as provided in this opinion.

CONCURRING OPINION

SWEET, P. J. January 5, 1967.—My brethren, for whom I have great respect, have differed 180 degrees on the construction of Act No. 373 and Act No. 328 of 1965. One of them concludes that it is obvious that these acts require the increases the police and firemen seek; the other finds it crystal clear that they do not. Where they find clarity, I find only opacity; where they see specificity, I see only confusion.

This little model of legislative incoherence provides for increases in police and firemen's salaries, as set forth hereinbelow, Act of December 1, 1965, No. 373, P. L. 1006, sec. 1, 53 PS §37001:

"The minimum annual starting salary or compensation to be paid the members of the police force by any city shall be four thousand five hundred dollars ($4,500), with minimum annual increments of three hundred dollars ($300) for the *first* three years of such employment. If the annual salary or compensation of any policeman employed by the city on the effective date of this amending act is less than four thousand five hundred dollars ($4,500), such salary or compensation shall be increased to four thousand five hundred dollars ($4,500), and such policeman shall receive minimum annual increments of three hundred dollars ($300) for the *next* three years of such employment". (Italics supplied).

The Act of November 9, 1965, No. 328, P. L. 670, sec. 1, 53 PS §37102, states:

"The minimum annual starting salary or compen-

sation to be paid the officers and firemen by any city shall be four thousand five hundred dollars ($4,500), with minimum annual increments of three hundred dollars ($300) for the *first* three years of such employment. If the annual salary or compensation of any fireman employed by the city on the effective date of this amending act is less than four thousand five hundred dollars ($4,500), such salary or compensation shall be increased to four thousand five hundred dollars ($4,500), and such fireman shall receive minimum annual increments of three hundred dollars ($300) for the *next* three years of such employment". (Italics supplied.)

I have italicized the words "first" and "next". This is done to point up the difference the legislature apparently intended between men already on the force making minimally adequate salaries and those not making such minimum.

Judge Price, of Allegheny County, also was compelled to construe this act at the behest of the police officers of McKeesport. He decided that the act (373) did not require third class cities to make any distinction between recruits and veterans in salary treatment. The interesting thing about Judge Price's interpretation is that to reach the result that the increase is not mandatory, he reads the word "thereafter" into the text of the act.[1] This lets the cat out of the bag.

Rather than read additional language into the text of the act, I would look to the canons of statutory interpretation, as set forth in the Statutory Construc-

[1] Altmiller v. City of McKeesport, April term, 1966, No. 3872, on page 5, says: "The statutory intention is that on and after January 1, 1966, *all* policemen in Third Class Cities will be paid a minimum of $4,500.00 per year and that *thereafter all* policemen in Third Class Cities will be given a *minimum* increment of $300.00 per year for each of the next three (3) years of service *if* their salaries are not then at or beyond such a minimum level."

tion Act.[2] It is unfortunate that one has to do this. The legislature should have made its meaning clear. It is unfortunate that we have to draw inferences from the difference between "first three years" and "next three years" or have to resort to case law in other fields or to the presumptions.

It would seem to me that this is beneficial legislation and should be read with the improvement of the police service in mind. In Iben v. Monaca Borough, 158 Pa. Superior Ct. 46 (1945), it was said that: "The basis for placing policemen and firemen in one favored class is reasonable and proper in the light of the quality of necessary public service sought to be obtained. The distinction between them and other municipal employees, generally, is real". This was said by the Superior Court in a case which concerned the payment of salary to police and firemen during a period of disability for injury in the performance of duty.

In this period in our national life, when crime runs rampant and the law enforcement officers find their work constantly made more difficult, and occasionally frustrated[3] by the decisions of the higher Federal courts, it is obvious that thought must be given to maintenance of the morale and efficiency of the police service. It is well known that the city police run far more risk of death and wounding than do librarians, or even deputy sheriffs (who make about $700 more, locally) ; nor should it be forgotten that in the troubles in Watts and Cleveland, the firemen responding to incendiary fire calls were stoned and shot at.

---

[2] Act of May 28, 1937, P. L. 1019, 46 PS §501 et seq.

[3] "What the Court largely ignores is that its rules impair, if they will not eventually serve wholly to frustrate, an instrument of law enforcement that has long and quite reasonably been thought worth the price paid for it". Mr. Justice Harlan et al., dissenting, Miranda v. Arizona, 384 U. S. 436 (1966).

The President of the United States has recognized the need for the improvement of crime prevention and protection and has made a recommendation for " . . . a substantial increase in police salaries to attract and retain the best qualified officers in the District of Columbia",[4] who are better paid than ours. Attorney General Katzenbach has given eloquent testimony to the need for better and better-paid law enforcement assistance.[5]

If the city is obliged to grant the increases, it will cost about $20,000 a year. This, it seems to me, is a small price to pay for maintaining Washington's police and fire departments in at least as good shape, personnel-wise, as they are at present. It does not appear in the record, but a sizeable number of policemen will be entitled to retire in the next two years. Their retention on the force is highly desirable.

If we really believe that legislation should promote and benefit the general interest and not the private interest, I think we should turn a deaf ear to the cries of the absentee landlords of Main Street properties and recognize that the safety of our people and their homes is the primary duty of local government.

Frankly, I do not know what Act No. 373 means, but I know what it ought to mean. Accordingly, I am concurring in the opinion of Judge Curran. Judge McCune's analogy to the school cases is persuasive and perhaps intellectually valid, but it leads to a socially undesirable result. President Johnson said of police work: "How well a job is done depends on the training and ability of the men who do it".[6]

Plaintiffs' brief suggests that Beaver Falls, Coatesville, Lancaster, Reading and York have accepted this

---

[4] President's Message, March 9, 1966; 112 Congressional 5146, reported in 3 U. S. Cong. & Admin. News '66, page 746.

[5] See Legislative History, Law Enforcement Assistance Act of 1965, 2 U. S. Cong. & Admin. News '65, page 3152 et seq.

[6] Johnson, Message on Crime, supra, p. 745.

interpretation of the relevant legislation. 'This should be somewhat persuasive.

My choice, then, is to agree, in result, with Judge Curran. It seems to me that the result he reaches meets the test of the first presumption, viz.,[7] that the legislature does not intend a result that is absurd, impossible of execution or unreasonable. He meets the fifth presumption that the legislature intends to favor the public interest as against any private interest. The second presumption, that the legislature intends the entire statute to be effective and certain, has been thwarted by the murky language used. The third and fourth presumptions do not apply.

Under these circumstances, I join in that opinion and the order sought by the police and firemen in mandamus.

## DISSENTING OPINION

McCUNE, J., January 5, 1967.—When the legislature provided that the minimum annual starting salary to be paid policemen should be $4,500 with minimum annual increments of $300 for the first three years of such employment and if, on the effective date of the act, anyone was earning less than $4,500 annually, his salary should be increased to $4,500 and he

---

[7] Statutory Construction Act of May 28, 1937, P. L. 1019, sec 52:

"(1) That the Legislature does not intend a result that is absurd, impossible of execution or unreasonable;

"(2) That the Legislature intends the entire statute to be effective and certain;

"(3) That the Legislature does not intend to violate the Constitution of the United States or of this Commonwealth;

"(4) That when a court of last resort has construed the language used in a law, the Legislature in subsequent laws on the same subject matter intend the same construction to be placed upon such language;

"(5) That the Legislature intends to favor the public interest as against any private interest".

also should receive annual increments of $300 for the next three years of such employment, the legislature meant, in my judgment, to fix a floor of $4,500 for all policemen, effective January 1, 1966, and to insure that within three years thereafter, all policemen would be earning at least $5,400.

In my view, the legislature did not mean that policemen already making $4,500 or more on January 1, 1966, should be given forthwith the annual increment of $300. This would not be due until January 1, 1967. On January 1, 1967, third class cities must pay all policemen at least $4,800. On January 1, 1968, they must all be paid at least $5,100 and on January 1, 1969, they must all be paid at least $5,400. Policemen who were already earning $5,400 on January 1, 1966, are not benefited by the act. (They have already reached the level at which the legislature aimed for January 1, 1969.)

In Washington, Pa., there are the following policemen:

(a) One chief of police, who is now being paid $5,956. He is not benefited by the act in question.

(b) Four lieutenants, who are now being paid $5,356. The act will not benefit them until January 1, 1969, when they will be paid $5,400. (Hopefully, by then, all police personnel will be paid more than $5,400 through the voluntary action of council.)

(c) Nine sergeants, one clerk and one detective, who are now earning $5,256 per year. The act will not benefit them until January 1, 1969, when they also will be raised to $5,400.

(d) Four corporals and one electrician, who are now being paid $5,156 annually. They will not benefit either until January 1, 1969, under the legislation we are considering.

This conclusion is not pleasing to this court, but no other conclusion is possible from a study of the act

in question. We regret that the salaries of policemen are not higher and the rate of advance in pay more rapid. For decades, the police of the nation and of this community have been underpaid, and the services they perform have been insufficiently appreciated. Their tasks have been arduous and dangerous and people generally, as well as legislators, are now beginning to realize the debt they owe police officers.

The interpretation just stated gives no consideration (as the legislature gave none) to the seeming disparity which might occur under the act between the pay of a veteran and the pay of a newcomer. If a veteran officer had worked for years at $4,500, he would continue to receive only $4,500 for the year 1966, while an officer hired on January 1, 1966, would receive the same pay. If this is unjust, it will be the task of the legislature to redress the injustice, because the courts cannot and should not legislate, and in our judgment, the act is not ambiguous.

In Hess v. Redstone Township School District, 18 Fayette 122 (1955), a similar conclusion was reached by the court when interpreting an amendment (Act of May 26, 1949, P. L. 1820) to the Public School Code of March 10, 1949, P. L. 30. This amendment (since repealed), per historical note in 24 PS §11-1142, read that "No professional employe shall receive for the school year 1948-1949 and for any year thereafter an increase of less than the amount of the full increment: Provided, That no school board shall be required to pay an amount in excess of the minimum salary and increments to which any employee is entitled under this schedule". The act set up a minimum salary schedule and provided that increments of $150 per year be paid for seven years. Although the professional employes of the school district were receiving salaries in excess of the minimum plus the increment for 1948, they demanded the increment for that year, arguing

that the increment was mandated whether their salaries equaled the schedule or not. The court stated that it was obvious that salaries in excess of the minimum plus the increment were being paid and that the act was meant to provide an incentive to a teacher to maintain his professional standards over the years, knowing he would be rewarded year after year. The court denied the increment.

Plaintiffs argue in the case at bar that an officer with 3 or more years of service should automatically earn $5,400, effective January 1, 1966. The act does not say this, and logic persuades against such an interpretation. If this argument is accepted, what happens for the next three years? Does the officer also earn the yearly increments and reach an annual salary of $6,300 on January 1, 1969? Plaintiffs argue this in the affirmative.

We believe the legislature recognized that some start should be made toward higher salaries. With cautious regard for the financial problems of third class cities, it started salaries at $4,500 and intended them to reach $5,400 within three years. This is as far as the legislature elected to look ahead. As the legislators have done with teachers' salaries from time to time, they will no doubt mandate further increases, so that in the years to come the salaries of officers will reach respectability, just as teachers' salaries have increased from year to year.

Had the legislature intended to provide additional pay for those earning $4,500 on January 1, 1966, it would have said so. It would have provided as it did in the School Code Amendment for the years 1956-57, where it provided that employes should receive an increase in excess of that paid for the year 1955-56 which should include any service increments to which employes were entitled under the 1949 code for the years 1956-57, and an additional payment of $200.

See Raymond v. Scranton School District, 186 Pa. Superior Ct. 352 (1958), in which the $200 was ordered paid even though the school district had provided pay at least equal to any mandated pay. The legislature has demonstrated that it knows how to direct extra pay over and above mandated minimums. All it did in the amendment to The Third Class City Code was mandate minimums and clearly specify the years to which they applied.

Benefits to a profession or class of employes must come over a period of years, so that orderly fiscal policies prevail, the absence of which are well known to the legislature.

These comments apply equally to the case brought by the firemen for an interpretation of similar legislation, including the comment that we think firemen are underpaid, but we have no power to legislate increases for them.

Accordingly, I dissent from the opinion and order of the majority.