[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 9296
I. INTRODUCTION
The plaintiffs in this appeal, the City of Hartford and the City of Hartford Purchasing Department, (hereinafter referred to as "the City"), challenge the decision of the Freedom of Information Commission ("FOIC") in favor of the defendants, Eric Lipton, Anita Seline and The Hartford Courant. In its decision the FOIC found that the City failed to provide the defendants with prompt access to the files they requested. The files in question contained the responses of ten construction management companies to the City's request for proposals[1] to perform construction management services on what is referred to as the Moylan Elementary School project ("Moylan project") and certain evaluations of these responses.[2] For the reasons set forth below, I affirm the FOIC's decision in part and reverse it in part.
II. STATEMENT OF FACTS
In November 1990, the voters of the City of Hartford approved a $21 million bond ordinance to finance the Moylan project. At a later referendum, a $200 million, five to ten year school construction program was approved. An April 21, 1993 letter of the City Manager to the Mayor and Common Council, contained in the record, states that:
 The City is about to embark on a $200M, five to ten year school construction program. It is clear that this amount of construction work can not be fully managed in house due to constraints on staff size. For this purpose, the City solicited proposals to hire a Construction Manager to act as the City's eyes and ears and to protect the City's interest by ensuring that all City requirements are met.
 The Moylan Elementary School Project affords the City an unique opportunity to put the CM strategy into place to become familiar and comfortable with the process and to work out any difficulties prior to the new school construction program going into full swing. In addition, the CM strategy will help the City accomplish minority and female contracting goals, including CT Page 9297 affirmative action goals. Finally, the City needs to "stimulate" the local CM market for public facilities construction.
On October 28, 1992, the City issued a Request For Proposals (RFP) that, in its words, solicited "proposals from qualified construction management firms to provide bidding and construction phase management services for the Moylan Elementary School." The services, at a general level, include "review of construction documents, preparation of sub-contractor bid packages, bidding, construction administration, and construction management services during the construction phase." A rather lengthy statement of "Scope of Services" includes, among other things, "Make recommendations concerning construction feasibility, availability of labor and materials, and the time required for installation and construction of the project;" "Prepare and coordinate a detailed plan for the total development of the project, including a computerized CPM schedule;" and "Provide necessary field supervision and inspections to assure that all work is in conformance to the contract documents."
The nature of an RFP is best explained as follows:
 Implicit in the definition of an RFP is the underlying rationale that, in some types of competitive procurement, the agency may desire an ultimate goal but cannot specifically tell the offerors how to perform toward achieving that goal; thus, a ready distinction arises between an RFP and an IFB [Invitation for Bids]. Typically, an IFB is rigid and identifies the solution to the problem. By definition, the invitation specifically defines the scope of the work required by soliciting bids responsive to the detailed plans and specifications set forth. . . . On the contrary, an RFP is flexible, identifies the problem, and requests a solution. Consideration of a response to an IFB is controlled by cost, that is, the lowest and best bid, whereas consideration of an offer to an RFP is controlled by technical excellence as well as cost.
System Development Corp. v. Department of Health RehabilitativeServices, 423 So.2d 433, 434 (Fla.Dist.Ct.App. 1982). Consistent with this concept, the City's RFP required detailed proposals including, among other things, "a written discussion in sufficient detail to demonstrate an understanding of the CT Page 9298 project's scope and the services required," "a detailed written summary of the firm's history and experience and capability in providing Construction Manager services," a "project management system," and "a detailed, itemized plan of proposed services."
The record contains the proposal of the ultimately successful applicant. This is an extremely detailed and technical work setting forth hundreds of proposed tasks from the initial site preparation and excavation to the installation of hardware. Items such as the precast concrete, unit masonry, and structural metals to be used are described in meticulous detail and technical language.
An advisory panel[3] assisting the City Manager in the selection of a construction manager completed Proposal Evaluation Sheets on each proposal. The Proposal Evaluation Sheets are not technical in nature. Each evaluator is asked to indicate by writing Yes or No whether the proposal is or is not responsive in twelve specific areas. These areas include understanding of the project, experience, staff plan, and service delivery plan. Each evaluator is then asked to rate the respondent's overall proposal against the criteria for selection contained in the RFP on a rating scale of 1 to 15 points. Finally each evaluator is asked to provide specific comments on the strengths and weaknesses of the proposal. Some Proposal Evaluation Sheets in the record contain no comments, and some comments are illegible, but it is fair to categorize most comments as summary rather than technical —e.g. "extensive experience" or "no experience in school construction."
After reviewing the merits of each applicant and interviewing five of the ten contenders, the advisory panel submitted the names of three contractors to the City Manager on January 8, 1993. See Hartford, Conn., Munic. Code § 2-604(3) (1977). From this short list, one contractor was chosen by the City Manager and submitted to the Hartford City Council for approval.Id. Although the first recommendation, made by letter dated February 17, 1993, was rejected by the City Council, the City Manager's second recommendation, made by letter dated April 21, 1993, was received favorably. As such, on May 19, 1993, the Hartford City Council designated the second contractor as the construction manager for the Moylan project in accordance with § 2-604 of the Hartford Municipal Code. The acting purchasing agent for the City then contracted with the prevailing company. Ultimately, a letter of intent was signed on June 26, 1993. CT Page 9299
The defendants began the process leading to this case following the City Manager's first recommendation. On March 4, 1993, they requested "access to files on the 10 companies that responded to a request for proposal for the construction manager of the Moylan Elementary school [sic] project" pursuant to the Freedom of Information Act. Conn. Gen. Stats. §§ 1-7 through1-21k. The City, through its acting purchasing agent, denied this request in a letter dated March 8, 1993, explaining that the release of the documents requested might "jeopardize the competitive procurement process" and is not required under the Freedom of Information Act. The defendants appealed the City's decision to the FOIC on March 23, 1993.
By July 7, 1993, the date of the FOIC hearing, the letter of intent between the successful contractor and the City had been executed and all documents relating to the procurement process in this matter were made public. At the hearing, the City gave the defendants access to the records they sought. Nevertheless, the FOIC rendered a decision on the issue of whether the access given satisfied the promptness requirements of Conn. Gen. Stats. §§1-15 and 1-19(a). The City contended below that Conn. Gen. Stat. § 1-19(b)(7) exempts procurement records such as the ones in question from the disclosure requirements of the Freedom of Information Act. Furthermore, the City argued that records such as the ones at issue are necessarily confidential during the procurement process until the time when the City receives a signed letter of intent from the successful contractor.
The FOIC disagreed, holding summarily that § 1-19(b)(7) "does not exempt from public disclosure the applications provided in response to an agency's request for proposal for construction management services, or the agency's evaluations of such applications." It concluded that the City violated Conn. Gen. Stat. §§ 1-15 and 1-19(a), "when it failed to provide prompt access to inspect the record by the complainants." It then issued the following order: "Henceforth the respondent shall strictly comply with the provisions of §§ 1-15 and 1-19(a), G.S." The City now appeals from this decision.
III. AGGRIEVEMENT AND MOOTNESS
Before turning to the merits of this appeal, the preliminary issues of aggrievement and mootness must be addressed since they implicate this court's jurisdiction to entertain this appeal. CT Page 9300Housing Authority v. Lamothe, 225 Conn. 757, 763, 627 A.2d 367
(1993) (mootness), Zoning Board of Appeals v. Freedom ofInformation Commission, 198 Conn. 498, 501, 503 A.2d 1161 (1986) (aggrievement). Neither the doctrine of aggrievement nor that of mootness spring directly from the language of the Connecticut Constitution.[4] Instead, the former is a child of legislative action, see, e.g., Conn. Gen. Stat. § 1-21i(d) (governing appeals brought to the Superior Court from decisions of the FOIC); Conn. Gen. Stat. § 4-183(a) (governing appeals from decisions of administrative agencies); Conn. Gen. Stat. §12-422 (governing appeals from certain decisions of the department of revenue services), the latter of judicial restraint, see Replyof the Judges of the Supreme Court to the General Assembly,33 Conn. 586 (1867).
A. AGGRIEVEMENT
Two separate aggrievement concerns exist here. The first calls into question the FOIC's jurisdiction to decide the defendants' claims when, after initially denying access, the City released the requested procurement documents at the FOIC hearing. Secondly, I must address the issue of whether the City is aggrieved by the FOIC's order.
Conn. Gen. Stat. § 1-21i(b) provides that, "Any person denied the right to inspect or copy records under section1-19 . . . or denied any other right conferred by sections . . .1-19 to 1-19b inclusive, . . . may appeal therefrom to the freedom of information commission. . . ." After the defendants' request was initially denied by the City, they appealed to the FOIC. Although the defendants were given the procurement documents at the time of the hearing, a question remained as to the promptness of the access provided. The right to inspect public records promptly is a right bestowed by § 1-19(a). Since the issue of promptness existed after disclosure of the procurement documents, the FOIC had jurisdiction over this matter.
Likewise, Conn. Gen. Stat. § 1-21i(d) permits an appeal to the Superior Court by "[a]ny party aggrieved by the decision" of the FOIC. The City is such an aggrieved party.
The statutory provisions specified in the FOIC's order govern the procedure for requesting and providing access to public records. Although this order is prospective in nature, this fact does not foreclose the possibility that the City is aggrieved. CT Page 9301See Board of Pardons v. Freedom of Information Commission,210 Conn. 646, 556 A.2d 1020 (1989); Zoning Board of Appeals v.Freedom of Information Commission, supra.
Aggrievement "`"is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. See, e.g., Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691,7 L.Ed.2d 663 (1962); Stern v. Stern, 165 Conn. 190, 192, 332 A.2d (1973)."'" Rose v. Freedom of Information Commission, 221 Conn. 217,223, 602 A.2d 1019 (1992). In accordance with these principles, there is a two-prong test for aggrievement in appeals such as this that requires: "(1) a specific personal and legal interest in the subject matter of the FOIC decision; and (2) a special and injurious effect on this specific interest. ZoningBoard of Appeals v. Freedom of Information Commission, 198 Conn. [at] 502; Local 1303 Local 1378 v. Freedom of InformationCommission, 191 Conn. 173, 176, 463 A.2d 613, (1983)." Board ofPardons v. Freedom of Information Commission,210 Conn. at 649-50.
With regard to the first prong of the test, the City has a personal and legal interest in the subject matter of the FOIC's decision. Generally, the FOIC's decision evaluates the City's compliance with the Freedom of Information Act in providing access to the records it acquires and maintains. See Battles v.Freedom of Information Commission, CV 93 0519904, p. 4 (Maloney, J., October 18, 1993). More specifically, the FOIC's decision calls into question the City's authority to withhold documents involving requests for proposals until the procurement process is concluded (i.e., a letter of intent is executed).
The second prong is more problematic. Nevertheless, I find that the City's interest was injuriously affected by the FOIC order and decision. The City argues that the FOIC's order requires the City in the future to disclose requested documents related to the competitive procurement process at any time during the process, including the deliberations of the advisory committee and the City Council. The City further maintains that such an order could negatively affect the operation of the procurement process. However, the FOIC's order read literally merely directs the City to comply with the Freedom of Information Act. It does not specifically direct the City in the future to CT Page 9302 release these documents before the procurement process is completed. How can the City's position and this fact be reconciled?
In Zoning Board of Appeals v. Freedom of InformationCommission, 198 Conn. at 502, a case involving an order that solely required the appealing party to comply with the pertinent statute, our Supreme Court considered the FOIC's order in tandem with the FOIC's decision. Viewing the order and the decision together, I find that the FOIC determined the City's failure to immediately disclose the requested documents was illegal and prospectively ordered the City to comply with §§ 1-15 and1-19(a) as interpreted by the FOIC in its decision.
Therefore, the question becomes: what injury, if any, befalls the City if its employees refuse to provide access to procurement documents before the procurement process is completed? Members of the City of Hartford's purchasing department and perhaps other employees would be subject to criminal sanctions. According to Conn. Gen. Stat. § 1-21k(b) "[a]ny member of any public agency who fails to comply with an order of the freedom of information commission shall be guilty of a class B misdemeanor and each occurrence of failure to comply with such order shall constitute a separate offense." In comparable cases, our Supreme Court has found that this risk is adequate to establish aggrievement. See Board of Pardons v. Freedom of InformationCommission, 210 Conn. at 650; Zoning Board of Appeals v. Freedomof Information Commission, 198 Conn. at 502.
Our Supreme Court has also expressed its concern that even a generalized, prospective order of the FOIC may injure public agencies as these orders affect the decision-making processes of these public agencies. Id. See Board of Pardons v. Freedom ofInformation Commission, 210 Conn. at 650-51 (recognizing the effect of a prospective FOIC order on the Board of Pardon's legitimate institutional interest in the integrity of its decision-making process imputed standing on the Board of Pardons). Zoning Boardof Appeals v. Freedom of Information Commission involved an FOIC decision that the North Haven Zoning Board (the board) improperly held a private executive session to obtain legal advice on a pending use variance request. 198 Conn. at 502. The FOIC ordered the board to "henceforth comply with the requirements of [Conn. Gen. Stats. §§] 1-21 and 1-18a(e)(5)." The trial court vacated the FOIC's order. Justice Shea explained: "if the order had not been vacated by the Superior Court, it would undoubtedly have had a chilling CT Page 9303 effect on the [board] the next time it contemplated calling an executive session in order to secure legal advice." Id. The court summed up by stating: "Although the FOIC order did not explicitly subject the [board] to a penalty or overturn its decision, the [board] was aggrieved." Id. at 503.
Here, the FOIC's order will have a chilling effect on the City's policy to withhold procurement documents. It is for these reasons that I conclude that the City is aggrieved by the decision of the FOIC.
B. MOOTNESS
Despite the fact that before the issuance of the FOIC's order the City provided access to the documents requested, this appeal is not moot. "`In the absence of an actual and existing controversy for us to adjudicate in any sense of the term, the courts of this state may not be used as a vehicle to obtain judicial opinions on points of law . . . and where the question presented is purely academic, we must refuse to entertain the appeal.' (Citations omitted.) Connecticut Foundry Co. v.International Ladies Garment Workers Union, [177 Conn. 17, 19,411 A.2d 1 (1979)].'" Board of Education v. Board of LaborRelations, 205 Conn. 116, 124, 530 A.2d 588 (1987). Furthermore, "`[m]ootness applies to situations where events have occurred during the pendency of an appeal that make [a court] incapable of granting practical relief through a disposition on the merits.'" (Citations omitted.) Housing Authority v. Lamothe,225 Conn. at 763. I find that such relief is available.
To begin, I note that this is not a case where the parties have settled their differences. Compare Sobocinski v. FOIC,213 Conn. 126, 134, 566 A.2d 703 (1989) (where underlying personal injury action related to a single automobile accident was withdrawn). An honest dispute remains as to whether the documents requested were exempt from the disclosure provisions of §1-19.
If this case is dismissed now; the FOIC's order[5] will have a "chilling effect" on the City the next time it contemplates withholding procurement documents when facing a request for those documents before the procurement process is completed. See Zoning Board of Appeals v. Freedom of InformationCommission, 198 Conn. 498. This is the case despite the fact that the City believes that it may properly withhold these documents under CT Page 9304 § 1-19. The impact of the order is especially troubling where, as here, some City employees may face criminal sanctions for not adhering to the FOIC's order. See Conn. Gen. Stats. §1-21k(b). With that order vacated, there would be no "chilling effect" on the City's decision to withhold procurement documents until the process is concluded. Because I can render relief to the City from the effect of the FOIC's order by reversing the FOIC's decision, this appeal is not moot and I may move on to address the merits of the City's appeal.
IV. THE MERITS
Conn. Gen. Stat. § 1-19(b)(7), the sole statutory provision relied upon by the City, exempts from disclosure under the Freedom of Information Act:
 the contents of real estate appraisals, engineering or feasibility estimates and evaluations made for or by an agency relative to the acquisition of property or to prospective public supply and construction contracts, until such time as all of the property has been acquired or all proceedings or transactions have been terminated or abandoned, provided the law of eminent domain shall not be affected by this provision. . . .
Two problems with respect to this statutory text must be addressed in this case. First, are the records sought to be disclosed "engineering . . . estimates and evaluations"? Second, were those records made "relative . . . to prospective public . . . construction contracts"? These questions must be asked with respect to each of the two types of records at issue in this case: the responses to the request for proposals and the evaluations of those responses.
Before discussing the merits, it is helpful to discuss certain relevant maxims of statutory construction. "The purpose of statutory construction is to determine the intent of the legislature." Department of Administrative Services v. Employees'Review Board, 226 Conn. 670, 678, 628 A.2d 957 (1993). Ordinarily, the courts afford "deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes." Id. The agency's determination, however, "is only persuasive not dispositive. `The interpretation of statutes presents a question of law'; Board ofCT Page 9305Education v. Freedom of Information Commission, 217 Conn. 153,158, 585 A.2d 82 (1991); which is ultimately for the court to decide." University of Connecticut v. Freedom of InformationCommission, 217 Conn. 322, 328, 585 A.2d 690 (1991). "Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny, as in this case, the agency is not entitled to special deference."Department of Administrative Services v. Employees' Review Board,supra, 226 Conn. at 678-79.
As a general matter, judicial "construction of the FOIA must be guided by the policy favoring disclosure and exceptions to disclosure must be narrowly construed." Superintendent of Policev. Freedom of Information Commission, 222 Conn. 621, 626,609 A.2d 998 (1992). Our Supreme Court has recently reminded us, however, that:
 This rule of construction . . . is not determinative. Indeed, although the act was intended as a general matter to promote openness in government . . . the act itself recognizes competing interests, and the need for some governmental records to remain confidential, at least initially.
Gifford v. Freedom of Information Commission, 227 Conn. 641, 652,631 A.2d 252 (1993). Because the objective of statutory construction is to give effect to the intended purpose of the legislature, id., my primary task is to ascertain the fair meaning of the legislative language.
The first textual question that must be addressed is whether any of the records sought to be disclosed are "engineering . . . estimates and evaluations." (Emphasis added.) The FOIC argues that none of the relevant records meet this description, but it has failed to articulate, either in its ruling or in its argument to this court, any definition of the word "engineering." The Freedom of Information Act itself does not define the term, so reference must necessarily be made to other materials.
Conn. Gen. Stat. § 20-299(1), a licensing statute, defines the term "[p]rofessional engineer" as follows:
 "Professional engineer" means a person who is qualified by reason of his knowledge of mathematics, the physical sciences and the principals of CT Page 9306 engineering, acquired by professional education and practical experience, to engage in engineering practice, including the rendering or offering to render to clients any professional service such as consultation, investigation, evaluation, planning, design or responsible supervision of construction, in connection with any public or privately-owned structures, buildings, machines, equipment, processes, works or projects wherein the public welfare or the safeguarding of life, public health or property is concerned or involved . . . .
This definition is narrower than the dictionary definition of "engineering" — viz. "the science by which the properties of matter and the sources of energy in nature are made useful to man in structures, machines and products." Webster's Third NewInternational Dictionary, 752 (1961). See Employers' LiabilityAssur. Corp. v. Accident Casualty Ins. Co., 134 F.2d 566, 569
(6th Cir. 1943); Iowa State Board of Engineering Examiners v.Electronic Engineering Co., 154 N.W.2d 737, 740 (Iowa 1967). The dictionary definition of "engineering" is similar to the somewhat more succinct and eloquent definition of the term contained in the 1828 charter of the British Institute of Civil Engineers, which asserts that engineering is "the art of directing the great sources of power in nature for the use and convenience of man." This latter definition is still considered "accurate and adequate." Eugene S. Ferguson, Engineering and the Mind's Eye 1 (1992). Our Supreme Court has held that the concept of "engineering" has a broader ambit than the term "professional engineering." E.I.S., Inc. v. Connecticut Board of Registration,200 Conn. 145, 149, 509 A.2d 1056 (1986). Nevertheless, the statutory definition of "professional engineering" is a useful starting point.
Under the licensing statute just quoted, a "professional engineer" is a person qualified to render certain specified professional services, including "planning, design or responsible supervision of construction." These are exactly the professional services requested in the RFP and set forth at length in the response to the RFP contained in the record. It is true that the RFP does not on its face require the successful applicant to employ a licensed professional engineer and that the response contained in the record fails to indicate whether the successful applicant did indeed employ a licensed professional engineer, or, for that matter, anyone with "knowledge of mathematics, the CT Page 9307 physical sciences and the principals of engineering, acquired by professional education and practical experience." On the other hand, it is clear that the RFP specifies that the construction manager is to plan and supervise the construction. Moreover, the response contained in the record is far more detailed and technical than the evaluation found not to be the work required of a professional engineer in E.I.S., Inc. v. Connecticut Boardof Registration, supra.
If this were a licensing case, the deficiencies in the record would not permit me to determine with confidence whether the response in the record is or is not the work of a "professional engineer." This is not, however, a licensing case. Rather, I am asked to determine the ambit of Conn. Gen. Stat. § 1-19(b)(7) which pertains simply to "engineering . . . estimates and evaluations." For this purpose, the record is more than adequate to establish that the responses to the RFP in question are indeed "engineering" estimates and evaluations.
"Many job classifications in both public and private employment use the word `engineer' to designate types of employment that obviously do not require the same knowledge and special training in the fields [of] mathematics, physics, and chemistry as is prerequisite to registration as a professional engineer." State ex rel. Wisconsin Registration Board v. T.V.Engineers of Kenosha, Inc., 141 N.W.2d 235, 239 (Wis. 1966). SeeNorth Carolina State Board of Registration v. InternationalBusiness Machines Corp., 230 S.E.2d 552, 556 (N.C.App. 1976);Howarth v. Gilman, 73 A.2d 655, 658 (Pa. 1950). The dictionary definition of "engineering" quoted earlier is a broad one. A strong case can be made that even the most skilled engineers — the designers of bridges and aircraft, for example — have achieved technological success by using nonscientific modes of thought. See generally Eugene S. Ferguson,Engineering and the Mind's Eye, supra.
In any event, I am not here dealing with a backyard inventor or an unskilled laborer with a good idea. The City in its RFP sought responses from construction managers of considerable skill and experience for the purpose of supervising the construction and renovation of a school building. The response in the record is a detailed and technical affair that is plainly the work of an "engineer." I conclude that the responses to the RFP are "engineering . . . estimates and evaluations." CT Page 9308
A different conclusion must be reached with respect to the Proposal Evaluation Sheets. As explained in the Statement of Facts, supra, these documents are not technical affairs. Rather than being "engineering estimates and evaluations" they are evaluations of engineering estimates and evaluations. If the legislature had intended to protect such evaluations from disclosure in § 1-19(b)(7) it could easily have done so, but it did not. The City does not argue that the Proposal Evaluation Sheets are protected by any other statutory exemption. The FOIC correctly concluded that these documents are not engineering estimates and evaluations.
My conclusion that the responses to the RFP are engineering estimates and evaluations is not dispositive of the case as it pertains to those documents. The respondents argue that even if those records are engineering estimates and evaluations, they are not "relative to . . . prospective public . . . construction contracts." Rather, they argue, the RFP process here was a search for a construction manager. On its face, this is a plausible argument, for the City was unquestionably searching for a manager. To state the case this way, however, ignores the reality of the situation. The RFP and the response contained in the record bear little or no resemblance to an ordinary employment search. Rather, the City sought and obtained detailed proposals for the construction of a school building. These proposals, as already discussed, were engineering estimates and evaluations. The statutory language now seized upon by the respondents merely requires that these documents be "relative to . . . prospective public . . . construction contracts." (Emphasis added.) The word "relative," in the normal sense, merely requires that the proposals at issue have a connection with or reference to a prospective public construction contract. See Shaw v. Delta AirLines, Inc., 463 U.S. 85, 97 (1983). Such a connection plainly exists here. For these reasons, I conclude that the responses to the City's RFP are exempt from disclosure under § 1-19(b)(7), and that the FOIC erred when it held that the statutory exemption did not apply.
V. CONCLUSION
The appeal is sustained insofar as it relates to the responses to the RFP. It is dismissed insofar as it relates to the Proposal Evaluation Sheets.
Jon C. Blue CT Page 9309 Judge of the Superior Court