**KELLER v. BAUMGARTNER (two cases).**
**Nos. 8876, 8877.**

Circuit Court of Appeals, Seventh Circuit.

Feb. 20, 1946.

Rehearing Denied March 12, 1946.

Victor M. Harding, Jr., and Herbert C. Hirschboeck, both of Milwaukee, Wis., and Warren Canaday and Joseph A. Struett, both of Chicago, Ill., for appellant-cross-appellee.

Maxwell H. Herriott and Carl G. Gezelschap, both of Milwaukee, Wis., for appellee-cross-appellant.

Before SPARKS and KERNER, Circuit Judges, and BALTZELL, District Judge.

SPARKS, Circuit Judge.

This is an action for an accounting and judgment to recover commissions in the sum of $15,000, alleged to be due plaintiff under a written contract. The defendant by answer denied all material allegations, and filed a counterclaim in which he sought a recovery of $717.36 and costs. The court made findings of fact, entered its conclusions of law thereon, and on June 2, 1945, rendered judgment thereon for plaintiff for $1,962.16 and for costs in the sum of $117.-35. Both parties appeal from this judgment.

In this record plaintiff is sometimes referred to as Keller, President of Keller Engineering Company, and the contract herein relied upon was signed on behalf of defendant as Reliable Tool and Machine Works, per J. R. Baumgartner, Owner. As we understand from the record, these names are merely trade names, and neither was incorporated. We shall refer to the parties by their personal names.

The following facts are supported by substantial evidence:

During the times herein referred to, Keller was a resident of Chicago, and was engaged in the engineering and sales service business. Baumgartner was a resident of Milwaukee, Wisconsin, and was a sole trader doing business at that place under the name of Reliable Tool and Machine Works, and was engaged in the manufacture of tools and machinery and in the machine tool business.

In the spring of 1943, defendant replied to Keller's circular letter, and on August 17, 1943, Keller called at the defendant's plant and, as a result thereof, the parties entered into a contract which Keller had prepared. It was in the form of a letter directed to Keller and was signed by Baumgartner, and accepted in writing by Keller. It was entitled "Engineering Service Agreement" and among other matters it contained the following pertinent paragraphs:

"We hereby retain your services and authorize you to represent us in connection with such services as we elect to make available to you.

"We may want your assistance regarding sub-contracting, shop practice, procuring materials and such other services as you customarily render.

"It is understood that any service which we make available to you will be figured at prices in which we will eliminate our usual customary selling cost.

"We agree to pay you, and you agree to accept, as full compensation for your services, a service fee equal to 10% of the gross billing on orders secured directly or indirectly through your efforts, in the absence of some other predetermined basis for specific service.

"Subsequent orders, from the same sources, shall carry the same service fee

unless it'is mutually agreed that a change in rate is to be made in any instance."

At that time Keller advised Baumgartner of his intention to try to obtain business from the Pullman Standard Car Manufacturing Company and advised Baumgartner that he had dealt with Pullman for several years on behalf of other manufacturers. Previous to that time Pullman had been on Baumgartner's mailing list, and in the spring of 1943, Pullman contacted defendant with respect to certain router bits. Defendant's director of sales called on Pullman and discussed the matter, and samples were forwarded by Pullman as late as August 30, 1943.

Immediately after making the contract, Keller visited Pullman and contacted its production manager whom he had known for some years. He was later introduced to Mr. Bradley who was in charge of sub-contracting for Pullman at its Hammond plant. Keller told Bradley that he represented Baumgartner and other machine tool companies as direct factory representative on a commission basis. Baumgartner gave Keller several prints and specifications relating to elevator screw parts for a gun carriage so that Baumgartner might bid on the work. Keller sent these prints and specifications to Baumgartner, who submitted bids thereon through Keller to Pullman, for one tool and two screw contracts. The bids on the screw parts were rejected as being too high. Keller then submitted lower bids for the same work on behalf of another company and he made personal visits to the Pullman plant at least once or twice each week.

In the period following the signing of the contract, Keller sent out about 50,000 circulars advertising Baumgartner's facilities to a mailing list of 15,000 persons. He expanded his organization and employed on a commission basis three salesmen in Chicago, one in Detroit, and two full-time secretaries. Although he represented other concerns, Keller devoted 90% of his time to representing Baumgartner. His total operating expenses during this period were $12,000 to $15,000.

On October 27, 1943, Keller wrote a letter to Bradley suggesting that he visit Baumgartner's plant in Milwaukee. Bradley did so on November 2, 1943, and at the same time he visited other Milwaukee plants. He visited the defendant's plant for the purpose of determining whether its facilities could handle Pullman's sub-contracting work.

Prior to making this visit, Bradley inquired by phone of Baumgartner's production manager as to Keller's status, and when he was told that Keller was on a commission basis, he stated that he would have nothing to do with Keller and would place no orders with Baumgartner if Keller were connected with them. He repeated this statement to Baumgartner upon his visit to the plant. Bradley was Pullman's representative for sub-contracting, and orders for sub-contracts were issued by its purchasing department on instructions of Bradley.

On November 17, 1943, Baumgartner told Keller by phone to stay out of Pullman, and wrote him saying: "The Pullman Company pointed out to us some while back that they would not deal through any jobber and we therefore ask that you do not represent us with this firm since you cannot possibly represent us where it is contrary to the wishes of the customer." However, Keller at all times contended that he was entitled to a commission on any Pullman business and advised Baumgartner that he would hold him to a commission on all orders from Pullman.

The first two Pullman orders received by Baumgartner are dated November 18, 1943, and the third order is dated November 23, 1943. These three orders were secured by Baumgartner directly or indirectly through Keller's services. The first two orders were cancelled, but Reliable commenced shipments and billings under the third order. Keller was paid his commission on certain billings made under these first three orders, although all but a nominal amount of the first two orders were cancelled. Baumgartner did not send Keller copies of invoices or otherwise notify him that these Pullman orders had been received.

On December 4, 1943, January 11, 1944, and July 19, 1944, Baumgartner received three additional orders from Pullman amounting respectively to $98,943.02, $53,550, and $16,040, no notice of which was given to Keller by Baumgartner.

Keller frequently complained to Baumgartner of his failure to furnish copies of inquiries, orders and invoices. On January 20, 1944, he instituted suit against Baumgartner in the Circuit Court of Milwaukee County, Wisconsin, for an accounting un-

der the contract, for $15,000, which he alleged was due him for commissions. At defendant's invitation, Keller, with his attorney and accountant, came to the Reliable plant. At the accountant's request he was shown defendant's open order file from which, together with the invoice billing register, a statement was prepared purporting to show the total merchandise invoiced to Keller's accounts and also the amounts still on order. This statement failed to reveal any amounts still on order with the Pullman Company. No information was given Keller or his accountant concerning two large orders that had been received from Pullman. The statement contained a computation of the commissions owing to plaintiff. The accounts listed in the statement, other than Pullman, were six in number. The commission at 10%, less amounts theretofore paid, amounted to $562.81. Thereupon Baumgartner prepared a statement addressed to plaintiff, in part as follows:

"Agreeable with our understanding of today, we are handing you herewith our check in the amount of $562.81 in payment of commissions due you to date on billings on orders secured through your efforts."

Without knowledge of the two large orders from Pullman, plaintiff accepted the check and thereafter dismissed the suit pending in the state court.

Baumgartner's statement to plaintiff also contained the following:

"It is understood that from now on you will receive copies of inquiries, quotations, work progress reports, shipping memos, and invoices in connection with any other business secured through your efforts in accordance with the terms of our contract of August 17, 1943.

"As of this date according to our records, we have on hand unfilled orders as follows:

| | |
|---|---|
| Amertorp Corporation | $   611.00 |
| Dynamatic Corporation | 945.00 |
| Link-Belt Company | 32,248.41 |
| Cullman Wheel Company | 1,600.00 |

"You will be entitled to 10% service fee on all of these orders excepting Link-Belt on which you will receive 5%."

Later, Keller demanded of Baumgartner further information regarding orders from or shipments to Pullman. Baumgartner's reply made no mention of the two large Pullman orders, nor of a shipment and invoice to Pullman on November 23, 1943, or eight billings to Amertorp Corporation. Keller replied that the explanation was not satisfactory.

Previously, Keller had obtained an order from Todd & Brown, Inc., and at the latter's request, Keller billed the items to that purchaser in the sum of $724. The amount of this bill was remitted to Keller and he advised Baumgartner that he would hold this remittance until he was satisfied that Baumgartner was living up to his contract. Keller still holds this amount.

On February 28, 1944, Baumgartner wired Keller that he was cancelling the contract "effective immediately" because of Keller's performance in the Todd & Brown matter. On the following day Baumgartner commenced shipments on the two large Pullman orders, dated December 4, 1943, and January 11, 1944, respectively.

The services which the contract contemplated Keller should render were sales services to be performed in the Chicago area. These did not include professional engineering services to be rendered in the State of Wisconsin. Keller was a registered engineer but he was not licensed in Wisconsin. The statute of that state required licensing of persons practicing or offering to practice professional engineering in Wisconsin. Section 101.31(1), Wis. Stat. However, Keller's duties under the contract were merely incidental to his selling, and what he may have done in this respect related only to advice as to the kind of machinery to be used or the manner of using the same.

The last paragraph of the contract contained the provision that the term of the agreement should be for one year from the date of its acceptance, and that it should be continued in full force and effect thereafter until terminated by either party on 90 days written notice.

From these facts the District Court concluded that Keller was not required by the Wisconsin statutes to secure a license as a professional engineer in the State of Wisconsin in order to perform his part of the contract. It was not unlawful to perform the services which he actually rendered in Wisconsin or which he could be called upon to render. The contract was not violative of the statute and Keller was not barred by that state from recovering under his contract.

The District Court concluded that Keller was entitled to recover from Baumgartner commissions at the rate of 10% upon the following invoices from the following named companies, except the invoice from Link-Belt Company, for which the parties agreed the commission should be 5%.

The court further concluded that from the total of these commissions there should be deducted the Todd & Brown, Inc., remittance and the commissions already paid by Baumgartner to Keller, as shown by the following tabulation:

| Name of Company | Amount Invoice | Commission |
|---|---|---|
| Amertorp Corporation | $ 7,339.00 | $ 733.90 |
| Automatic Products Co. ............. | 957.32 | 95.73 |
| Cullman Wheel Co... | 1,483.18 | 148.32 |
| Dynamatic Corp. ... | 1,095.50 | 109.55 |
| Lear Avia, Inc. ..... | 19,753.72 | 1,975.37 |
| Link-Belt Co........ | 4,210.37 | 210.51 |
| Pullman Standard Car Mfg. Co. ..... | 3,931.10 | 393.11 |
| Todd & Brown, Inc. | 724.00 | 72.40 |
| Universal Paper Products Co. ..... | 475.88 | 47.59 |
| Total ......... | | $3,786.48 |

Deduct:

| | | |
|---|---|---|
| Todd & Brown, Inc. remittance ....... | $ 724.00 | |
| Commission paid.... | 1,100.31 | 1,824.31 |
| Net Balance.... | | $1,962.17 |

The court further concluded that in view of Bradley's refusal to place Pullman orders with Baumgartner if Keller was to have any part in the transaction, Baumgartner had the right under the contract to elect not to avail himself of Keller's services in connection with Pullman orders. Bradley had the final authority whether Baumgartner would receive the subcontract orders in question. There was no collusion between Bradley and Baumgartner, and there was no agreement between Keller and Baumgartner that Keller was to be paid a commission on Pullman business in any event, and Baumgartner's election not to avail himself of Keller's services was made in good faith.

It was further concluded that Keller did not commit a breach of the contract in receiving the Todd and Brown remittance, nor in retaining it until Baumgartner had

complied with the terms of the contract governing the payment of commissions and the giving of proper notice to Keller of inquiries, orders, and invoices.

The court further concluded that the termination provision of the contract meant that the contract was to remain in full force and effect for a minimum of one year, and the notice of cancellation given to Baumgartner on February 28, 1944, was sufficient to terminate the contract at the end of the one year period, namely August 17, 1944. On these conclusions of law the District Court rendered judgment in favor of Keller for the sum of $1,962.16 and costs in the amount of $117.35.

This controversy arises out of the construction of the first and last paragraphs of the contract hereinbefore set forth.

Keller contends broadly that he is entitled to recover commissions on the Pullman orders of December 4, 1943, January 11, 1944, July 19, 1944 and September 9, 1944.

Keller, on appeal, presented four points upon which he intended to rely. Three of these alleged errors in the court's conclusions of law, and the other alleged error in refusing plaintiff's requested finding (sic), which in fact was a conclusion of law.

In his contested issues here presented, Keller contends that the first paragraph of the contract gave Baumgartner the right to reject any inquiries or requests for bids which Keller might obtain, but he could not fill an order without payment of Keller's commissions, where the order was from a source originally secured directly or indirectly through Keller's efforts. On argument at the hearing he maintained that inasmuch as Pullman was originally secured as a customer for Baumgartner through Keller's services under the contract, and the former had accepted and filled orders secured by Keller from Pullman, Baumgartner could not avoid payment of commissions on subsequent orders directly from Pullman to Baumgartner, which Keller had rendered no direct service in procuring. In other words, having once elected to accept Pullman as a customer, Baumgartner could not thereafter, for any reason, elect to dispense with Keller's services with relation to the Pullman account. We think this contention places a construction upon the first paragraph of the contract which is entirely too broad. That language neither mentions nor refers to

customers, but to "such *services* as we elect to make available to you."

The court found that Baumgartner's action in ordering Keller to cease representing him with Pullman was in good faith and without collusion, and we are bound by that finding. Furthermore, we are convinced that the court properly construed the first paragraph of the contract, and that under the circumstances Baumgartner was well within his contractual rights in withdrawing the Pullman account from Keller's subsequent sales services. Keller has cited no authority supporting a different conclusion. See Rimling v. Scherper, 206 Wis. 532, 240 N.W. 159; Felton v. Stacey, 175 Wis. 471, 185 N.W. 536; General Electric Co. v. Chattanooga Coal & Iron Corporation, 4 Cir., 241 F. 38.

Among the contested issues set forth in Keller's brief, he urges that the record does not support the court's finding that Bradley told Baumgartner that he would give him no business if Keller were in the picture and received a commission. He also contends that the record is conclusive that Baumgartner promised to pay Keller commissions on the Pullman business despite the alleged threats and objections of Bradley. On these two issues he relies on evidentiary facts. It will be remembered that his statement of points relied upon in his appeal raised no issue as to the finding of facts. This of itself would be sufficient for us to sustain the findings. Keeley v. Mutual Life Insurance Co. of New York, 7 Cir., 113 F.2d 633. However, the findings are supported by substantial evidence, hence there is no merit in these two contested issues.

Keller further urges that even though Bradley's threats were made and constituted a defense, that defense was effectively waived for all time by the accounting of January 29, 1944. We have set forth that accounting with considerable particularity. There is nothing in it which could be considered a waiver of such defense with respect to the Pullman account after November 17, 1943.

Keller further contends that Baumgartner's telegram of February 28, 1944, could not terminate the contract until three months after August 17, 1944, that being the date of the expiration of the first year of the contract. In other words, he urges that under the last paragraph of the contract it was bound to run for a year and three months from its date. This contention is made for the purpose of securing his commission upon the sale made by Baumgartner to Pullman on September 9, 1944. There is no merit in this contention. Freiberger v. Texas Co., 216 Wis. 546, 257 N.W. 592. The court construed the last paragraph of the contract to mean that it could be terminated at the end of the first year providing three months notice prior to that time was given to Keller. This was done and we find no authority which warrants any different conclusion.

In the cross-appeal Baumgartner relies on the alleged errors of the court in finding that Keller's services as contemplated by the contract were sales services in the Chicago area and did not include professional engineering service to be rendered in Wisconsin; that the advice Keller offered as to the kind of machinery to be used or the manner of using the same, was merely incidental to selling. A reading of this evidence convinces us that these findings are substantially supported by the evidence. It is possible that different conclusions might be reached by different triers, however, we cannot say that the District Court's findings in these respects are not supported by substantial evidence.

Baumgartner urges that the court erred in concluding as a matter of law that Keller was not required by the Wisconsin statute to secure a license as a professional engineer, in Wisconsin, in order to perform the services contemplated by this contract; that it was not unlawful for Keller to perform the services which he actually rendered in Wisconsin under the contract or which he could be called upon to render there; that he did not violate the provisions of the Wisconsin statute in not securing a license in that state, either in the making of the contract or in his performance of it; that the contract was not void under that statute, nor is he barred from recovering under the contract by reason of that statute. We think this was a correct statement of the applicable law.

The judgment is affirmed with respect to both the appeal and the cross-appeal.