## JAY DEE SHOES, INC. *v.* OSTROFF

[No. 190, October Term, 1947.]

88

*Decided June 17, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Sidney Blum,* with whom was *Jacob Blum* on the brief, for the appellant.

*Paul L. Cordish* for the appellee.

GRASON, J., delivered the opinion of the Court.

This suit was instituted in the Baltimore City Court by Louis C. Ostroff against Modern Shoe Company, a corporation, and Jay Dee Shoes, Inc. for breach of a contract. At the conclusion of all the testimony in the case, the court directed the jury to find a verdict for the Modern Shoe Company, which was accordingly done,

and judgment entered thereon, from which no appeal was taken. At the same time the court overruled a demurrer prayer and permitted the case to go to the jury, as to Jay Dee Shoes, Inc. A verdict was rendered by the jury in favor of the plaintiff against that defendant, and, after the court overruled a motion N. O. V. and a motion for a new trial, judgment was entered on the verdict, and an appeal therefrom was taken to this court.

No exception to the evidence nor to the charge of the court to the jury is presented. The sole question argued in the briefs of counsel and at the bar, is whether the lower court committed error in refusing to rule as a matter of law that there was no evidence in the case legally sufficient to entitle the plaintiff (appellee) to recover against the Jay Dee Shoes, Inc. (appellant) and to direct a verdict in its favor. This involves the question of whether or not there was a conflict in the material evidence. If such was the case, it was the province of the jury to resolve the conflict and find the fact. The jury, in our system, is the fact finding body. A case is never taken from the jury unless, on all of the evidence submitted, there is no conflict of fact. If the testimony clearly shows there is no conflict of fact, a question of law is then presented. If the court, viewing the evidence and all reasonable inferences to be drawn therefrom most favorably to the plaintiff, finds as a matter of law that there is no evidence legally sufficient to entitle the plaintiff to recover, it is its duty to withdraw the case from the consideration of the jury and direct it to find a verdict for the defendant.

A discussion of the law in a case such as this is to be found in the cases of *Williar v. Nagle,* 109 Md. 75, 71 A. 427, 16 Ann. Cas. 982, and Id., 113 Md. 614, 77 A. 680. In the latter case at page 618 of 113 Md., at page 682 of 77 A., the court said:

"This is the second time this case has been before us, the former decision being reported in 109 Md. 75, 71 A. 427 [16 Ann. Cas. 982]. We then held that, if

an architect is employed to prepare plans and specifications for a building which is not to cost more than a specified amount, he is not entitled to recover compensation for them unless the building can be constructed, in accordance with them, at a cost which is not greater than or reasonably near that amount, and that ordinarily whether it can be so constructed is a question for the jury."

In *Schwender v. Schrafft*, 246 Mass. 543, 141 N. E. 511, at page 512, it is stated:

"One who proposes to build may in his contract of employment of an architect state an amount as the limit of cost of the building which is to be erected and provide that at least reasonable conformity to this requirement shall be a condition under which the services shall be rendered; or it may result from the terms of the agreement that the cost of the proposed building shall not be in excess of a definite maximum. If either result follows from the construction of the contract, liability for services is negatived unless the building can be built for an amount reasonably within restrictions upon expenditure. But a contract may be made in which the sum named is only by way of estimate, and where the instructions given require the preparation of plans and specifications for the construction of a building according to the expressed wishes of the owner as to size, method, and details of construction. In such a case, mere non-conformity in the cost of construction under the plans and specifications with the amount so estimated does not prevent a recovery, * * *."

The evidence shows that Jay Dee Shoes, Inc. and the Modern Shoe Company, a body corporate, were closely connected in business and management. Bour is the president of the appellant, and Kaplan is the superintendent of the Modern Shoe Company. The latter is engaged in the manufacturing of shoes; the appellant sells the shoes that the latter manufactures, at retail. These corporations, according to the testimony of appellee, "were interested in making certain changes in

property they had acquired at 17 South Hanover Street, Baltimore, Maryland, * * * which was occupied as a garage, with various factory lofts above." There was "a ramp going down into the basement". They desired to convert this garage into a large, two-story, modern, and rather luxurious retail shoe store.

Bour and Kaplan consulted the appellee with a view of employing him to draw plans and specifications for, and supervise the conversion of this old garage into a retail shoe store, generally described above. Appellee's offices are in New York City. Bour and Kaplan met Ostroff in his office in January, 1946. Thereafter Ostroff came to Baltimore and went over the premises with Bour and Kaplan and spent practically an entire day with them in going over the property. He was told by these men just what they wanted done, and he made suggestions to them as to how he thought the work should be done, and took measurements at the premises. They gave him "a small plot plan, which is a diagrammatic sketch of the building, that is, the particular area to be occupied". He was with them on that occasion for six hours; he says "practically the whole day". The inference is, from this testimony, that this project was gone over in detail by Bour and Kaplan with Ostroff, and he was informed what they wanted to do.

The matter of price was brought up, and Ostroff would not name a specific price for the completed project, because of general market conditions as to material and labor, which were fluctuating from day to day. Ostroff testified that he "told them I couldn't, under the circumstances, give them any accurate price, but the job would run approximately between $25,000 and $30,000 and they told me they would like to keep as close to $25,000 as they could." He then detailed what these people wanted done to the property.

Thereafter Bour saw in New York and in Florda some material which he wanted to use in this work, which was found by Ostroff. Ostroff submitted to Bour preliminary sketches and a blue print "showing the work in

detail." The preliminary sketches, according to Ostroff, show how the work that was to be done appeared on paper. Bour went to Ostroff's office in New York, with his associate, and discussed these drawings and the blueprint.

Ostroff says that upon his return from a visit to Baltimore he mailed to Bour, at his address in Baltimore, a copy of an agreement under which he would do this work. He says that when Bour came to New York to look at the sketches he had this agreement, which he had submitted to his lawyers, and certain changes were made therein by his lawyers, which Ostroff would not accept. The matter was then further discussed, and the result was a contract was signed on that day, which is as follows:

"March 26, 1946

Modern Shoe Co. and Jay Dee Shoes, Inc.
17 W. Baltimore Street.
Baltimore, Md.

Gentlemen:

In accordance with our arrangements of Friday, February 8th, 1946, you agree to retain me until completion as the Designer, Supervisor, and Coordinator in connection with the alterations at the premises 17 South Hanover Street, Baltimore, Md., comprising of a store front, sample room, offices, and mezzanine to house two offices, shower room, toilet, bar, and whatever other items you wish embodied in the plans and building.

I agree to prepare preliminary sketches and complete working drawings to embody all the necessary structural changes and decorative details, inclusive of electrical work, air-conditioning, plumbing, and whatever other items that are necessary.

I shall personally supervise and coordinate the erection and construction of the above named work, and will appear at the scene in Baltimore as frequently as required to carry out the terms of this agreement.

I am to have the right to retain as my agent and representative at my sole cost and expense a duly qualified en-

gineer or some other similar qualified person to file such structural alteration plans with the Baltimore Building Department as the job may require.

In consideration for all such services, you agree to pay me a sum equal to 10% of the total cost of the entire construction. Payments to be as follows:

Five Hundred Dollars ($500.00) upon the completion of working drawings. Balance up to 85% during the progress of the work to be paid monthly. Balance of said 15% to be paid within thirty (30) days following the completion of the work as provided for by the plans and specifications.

Very truly yours,
(signed) Louis C. Ostroff

LCO:FF
Accepted this 26 day
of March, 1946.
(signed) Harry G. Bour
Modern Shoe Co. and
Jay Dee Shoes Inc."

This contract was offered in evidence and not disputed. Ostroff's testimony, however, is that he informed Bour "the cost would be between $25,000 and $30,000". He said that he was not to "employ contractors and sub-contractors to do the work itself", and that Bour told him "he had a man down here whom he had had from time to time on various jobs as a superintendent and he would employ him to do all the structural changes, demolition and various necessary construction work on the premises and I told him he would probably save himself considerable money in that respect, if he did that".

The testimony is that after the contract was signed Ostroff prepared the plans, consisting of four sheets, which "include all the details and materials to be used on the job." The contract provided for the payment of "Five Hundred Dollars ($500.00) upon the completion of working drawings". It is not disputed that this was paid.

Demolition work was started and completed by a contractor employed by Bour. During the course of the

work it was necessary to lower the first floor, and in order to do this, steel beams that supported the ramp had to be removed. Kaplan called Ostroff about this, and Ostroff employed an engineer to attend to this work at a cost of $175, which he paid. Ostroff went to the premises, inspected the work, discussed various changes that were wanted. At that time "the garage floor was torn apart, the beams were being lowered and the balcony was to be erected, in other words the structural changes were on the way and Mr. Kaplan also had an electrician and plumber down there to discuss the routing of the various pipes in the basement that they wanted to shift over because they wanted to use it for stock rooms". After that "Mr. Bour was in my office on a couple of other occasions to go over various details of the job in line with what we were talking about, various types of finishes and other matters, glass, elevators, woodwork and so on". He said that he had conferences at his offices in New York, apparently with Bour, on five occasions. He also came to Baltimore in connection with this work, at the suggestion of Bour and Kaplan.

On April 3, 1946, Ostroff wrote Kaplan: "Harry (meaning Bour) told me that he would have the man who is working for you furnish me with all the necessary data so that I might be able to complete this job as rapidly as possible. To date I have not received same, and would appreciate getting this information at the earliest possible time."

There was a voluminous correspondence between Bour and Ostroff, dating from April 3, 1946, to August, 1946. Bour contended that he was not to employ a local contractor to do the work, and that it was Ostroff's duty to employ a contractor. Ostroff replied that it was his understanding that he (Bour) was to employ a contractor and that he (Ostroff) was to be called on from time to time for such supervision as was necessary. Bour, several times in this correspondence, charged that Ostroff said he would do the entire work for $15,000. This was denied. The correspondence shows that Bour seemed determined to have Ostroff name a specific sum which was

to cover the entire job. He evidently wanted such a price stated in a letter to him.

In a letter dated May 29, 1946, Bour stated to Ostroff: "you estimated that the cost based on your plans would not exceed $15,000.00". This was denied by Ostroff. In the same letter Bour said: "The lowest quotation we have received from any contractor is approximately $40,000.00" and "the writer wants you to give us a definite estimate from a reliable source as to what this remodeling will cost based on your plans within the week. If the price is not close to the $15,000.00 figure you originally gave us, I want the release of your contract and we are just going to put in a plain front and fix up the inside any old way. The man we had doing the rough work is finished with his part and we can use the back end as is." When Bour wrote Ostroff that he was to supply the contractors on this job, and Ostroff replied expressing his surprise, he, nevertheless, in that letter stated to Bour that it was hard to get New York contractors to come to Baltimore, and they would only come on a "cost plus basis". He wrote that he had been talking to two contractors, and asked Bour what he thought of this. Apparently there was no further discussion concerning this matter.

Orville S. Scrivener, of Baltimore, testified for appellant. He said he had been a contractor and builder for twenty-six years; that Kaplan submitted to him plans for remodeling 17 South Hanover Street for the purpose of getting a price on the alterations. These were the plans drawn by Ostroff. He said he estimated the cost, as provided by Ostroff's plans, to be $42,760, and that he made this estimate on May 3, 1946. His estimates on various items were considerably higher than Ostroff's. Glass, he estimated at $7500. Ostroff's estimate for the glass was $3380.00. Marble, Ostroff estimated at $5315. The witness estimated the cost to be $6550.

Michael H. Walbert, a professional builder and construction estimator of twenty-five years' experience, was called by the appellant. In 1946 he was employed by

Julius Myerberg, a licensed engineer in the City of Baltimore. He testified that Myerberg was the accredited architect for this job, and that Bour, in the latter part of May, 1946, presented a plan to him and wanted an estimate for the job. About ten days later, based on the plans given him, he estimated that the cost of the project would be $40,000. On cross examination this witness was asked: "How much did your firm get for doing this job altogether? A. I believe—frankly, I don't know what they got, I believe there is a balance outstanding. Q. Do you know approximately what it was? You supervised the job. A. Somewhere around $33,000. Q. You got that much from Mr. Bour? A. I believe it ran into that kind of money altogether with the fee of the job."

It was testified in the case that Ostroff should not have been paid for his drawings because to use them would have projected the property 17 South Hanover Street about a foot over the adjoining property; that he should have had the property surveyed, and not to do so before he started on drawing plans and making specifications was negligence. In view of the fact that Bour gave Ostroff a plat showng the property at 17 South Hanover Street, the failure to have the property surveyed, if it was evidence of negligence, was a question for the consideration of the jury. It is significant that after Bour contracted with Myerberg to do this work he still corresponded with Ostroff, and continued to do so until August, 1946, and the correspondence was finally concluded when Ostroff wrote him in October that he would have to place the matter in the hands of his attorney.

We think it apparent that there was sharp conflict between the evidence offered on behalf of the parties to this case, and it was the province of the jury to resolve this conflict and determine the facts. This being so, the learned judge below was correct in refusing the appellant's demurrer prayer, and the judgment must be affirmed.

*Judgment affirmed, with costs.*