**FOOD MANAGEMENT, INC., Appellant,**

v.

**BLUE RIBBON BEEF PACK, INC., Appellee.**

**BLUE RIBBON BEEF PACK, INC., Appellant,**

v.

**FOOD MANAGEMENT, INC., Appellee.**

**Nos. 19048, 19072.**

United States Court of Appeals
Eighth Circuit.

July 30, 1969.

John J. Greer and Jerry C. Estes, of James, Greer, Nelson & Bertell, Spencer, Iowa, for Food Management, Inc., Frank B. Nelson and James Q. Doran, of Cohen, Baron, Todd & Hogan, Cincinnati, Ohio, on the briefs.

C. Frederick Beck and David J. Butler, of Beck, Butler & Pappajohn, Mason City, Iowa, for Blue Ribbon Beef Pack, Inc.

Before VOGEL, MATTHES and BRIGHT, Circuit Judges.

VOGEL, Circuit Judge.

Food Management, Inc., an Ohio corporation, instituted this action against Blue Ribbon Beef Pack, Inc., an Iowa corporation, seeking recovery of the balance alleged due under a contract for architectural, engineering and other services. Blue Ribbon Beef counterclaimed for restitution of money paid to Food Management under the contract. Both parties appeal from a judgment against the claim and counterclaim. Federal jurisdiction is based upon diversity of citizenship and the requisite statutory amount in controversy. The substantive law of the State of Iowa controls. The parties will be referred to as in the court below.

Defendant Blue Ribbon is the successor by merger to Peter Piper Packers, Inc., also an Iowa corporation. On July 8, 1965, plaintiff Food Management entered into a written "turn key" contract with Peter Piper Packers whereby Food Management would design, supervise construction of and initially manage a meat packing plant at LeMars, Iowa. Food Management had previously completed a feasibility study for Peter Piper for which a price of $5,000 had been agreed upon and paid.

The written contract provided that whereas Peter Piper intended to construct and equip a facility to slaughter, chill and ship approximately 50 head of cattle per hour, expandable to a maximum potential of 70–75 per hour, it agreed to pay Food Management (the "Engineer") a fee of 8% of the cost of the work for the following services:

"1. *The Engineer's Services*

"A. The Engineer's professional services shall consist of the necessary conferences, the preparation of preliminary studies, working drawings, specifications, detail drawings for architectural, structural and mechanical work as well as for U. S. Department of Agriculture approval; assistance in the drafting of forms of proposals and contracts and assistance in selecting the Contractor or Contractors to perform the work. * * *

"B. The Engineer will make four (4) trips or as many trips as may be necessary for conferences, inspection, and coordination of the work. * * *

"C. The Engineer will furnish qualified personnel, to insure * * * proper construction, installation and operation of equipment. A qualified engineer will remain at the facility for a period of six weeks and such additional period as may be required after completion of construction for shakedown and personnel instruction.

"D. The Engineer will furnish a detailed estimate of cost, together with a detailed equipment list for the Packer's approval before architectural and mechanical drawings are started. The Engineer will obtain M. I. D. [Meat Inspection Division, Department of Agriculture] approval for the project and assures workability of the layout and that all drawings meet local and state building requirements.

"E. The Engineer shall furnish a complete manning list for all production jobs at specified production rates, with basic costs for each classification appropriate for the LeMars Labor market."

The contract also provided that Food Management would use its best efforts

to obtain a qualified major meat distributor willing to enter into a custom slaughter or "captive" contract with Peter Piper. Under such arrangement, the major packer would buy the cattle, ship them to the plant, pay Peter Piper for the slaughtering and processing services, and then would sell the beef. Food Management also agreed to assist Peter Piper to negotiate such a contract.

There was no cost limitation expressed in the contract.

On September 30, 1965, Food Management entered into a written contract with Johnson Jamerson Associates, licensed architects and engineers in Iowa, for the performance of part of the work under the general contract. This contract provided in part:

"2. THE PRINCIPAL CONSULTANT [Food Management] AGREES to provide the Associate Engineer [Johnson Jamerson] with complete information concerning the requirements of This Part of the Project and to perform the following services:

"A. Furnish Associate Engineer complete site information including topographic survey, property lines, utilities, soil test data and site plan showing proposed building location, walks, drives, railroad spur track and parking area. In general, the Principal Consultant shall assume the responsibility for all layout and design work beyond a line 5'–0" distant from the exterior walls of the proposed building. This work shall include:

"(1) Stock pens, drives and ramps

"(2) Grading and area drain location

"(3) Access roads

"(4) Water supply

"(5) Sewage disposal

"(6) Area lighting locations

"(7) Area drainage requirements

"(8) Heating requirements for room heat and watering tanks

"The exception to this condition shall be that work necessary to provide the layout of Plumbing, Heating and Electrical facilities for areas outside the boundary line mentioned above which shall be part of the design work furnished by the Associate Engineer. Within the building proper the Principal Consultant shall assume the responsibility for: Building layouts and those drawings required for M. I. D. approval and processing equipment layout and specifications. He shall also furnish to the Associate Engineer the following data:

"(1) Rail layout, rail loads, heights and clearances

"(2) Design live loads for floors and roofs

"(3) Room temperature requirements and product loads

"(4) Refrigeration loads in various rooms to be refrigerated

"(5) Lighting levels for various rooms

"(6) Ventilation requirements in air changes per hour

"(7) Water demand

"(8) Boiler load data

"(9) Utility requirements and connecting point of various items of equipment. * * *

\* \* \* \* \* \*

"C. Consideration of the Associate Engineer's Work: The Principal Consultant shall give thorough consideration to all reports, sketches, drawings, specifications, proposals and other documents presented by the Associate Engineer, and shall inform the Associate Engineer of his decision within a reasonable time so as not to delay the work of the Associate Engineer.

"D. Standards: The Principal Consultant shall furnish the Associate Engineer with a copy of any design and construction standards he shall require the Associate Engineer to follow in the preparation of drawings and specifications for This Part of the Project."

Food Management contacted major packers on Peter Piper's behalf concern-

ing the possibility of a custom slaughter contract. On December 15, 1965, Food Management informed Peter Piper that in order to enter into a captive contract with the prospective packer, Armour and Company, construction of a plant providing for a 70–75 head per hour kill rate and at a cost of $1,567,000 would be required. Peter Piper thereafter directed Food Management to proceed with the original plans for a 50 head per hour kill rate. On February 24, 1966, Peter Piper decided not to enter into a captive contract with Armour.

On or about March 8, 1966, Peter Piper signed a merger agreement with Blue Ribbon and informed Food Management that it would like a plant with a 40 head per hour capacity. On March 25, 1966, Peter Piper cancelled the contract with Food Management on the ground "Food Management had defaulted". At this point, Peter Piper had paid $24,000 to Food Management for services under the contract.

On the basis that Food Management had not designed a $1,000,000 plant, as Blue Ribbon alleges was orally agreed upon and was imposed as a cost limitation, Peter Piper refused to make any further payments to Food Management and demanded the return of the $24,000 which it had paid.

Food Management instituted this action to recover the balance due for services rendered under the contract, in the amount of $32,085.61. Blue Ribbon counterclaimed for recovery of the $24,000 Peter Piper had paid to Food Management.

None of Food Management's officers or employees was licensed to practice architecture or engineering in the State of Iowa during the period it performed services for Peter Piper under the contract.

In a trial to the court without a jury, the Honorable Edward J. McManus, Chief Judge, presiding, Blue Ribbon presented testimony to the effect that Food Management stated that the plant could be constructed for approximately $900,000, exclusive of land and architect's fee, or for $1,000,000 with facilities for hide curing and edible rendering, and that these figures were imposed upon Food Management as a cost limitation. Blue Ribbon also introduced evidence that the Food Management plans were for a plant that would have required over $1,800,000 to construct and equip. Food Management presented testimony to the effect that there was no cost limitation, but merely an estimate or approximation, and that the increase in cost of $1,567,000 resulted from following Peter Piper's instructions to increase the plant's kill rate from 50 to 70–75 head per hour in order to obtain a custom slaughter agreement with Armour and Company.

In an unpublished opinion, the trial court held:

1. "In performing the general contract plaintiff practiced professional engineering and architecture in violation of Iowa law. Iowa Code, §§ 114.1, 114.-26, 118.15, 118.21 (1966)." In a footnote accompanying this holding, the court stated:

"Although plaintiff retained a registered Iowa architecture and engineering firm, it is the court's view that plaintiff was 'in responsible charge' of the architectural and engineering work, and did not merely execute the plans of the Iowa firm. Therefore, plaintiff is not excused from registering by Iowa Code, § 118.17(2) (1966). Nor are the conditions of § 118.21 met, since Johnson Jamerson did not have responsible supervision of the entire practice of architecture contemplated under the general contract."

2. "Plaintiff is not entitled to recover on its claim." In a footnote to this holding, the court stated in part:

"The general rule is that a contract made in the course of a business or occupation for which a license is required by one who has not obtained a license is unenforceable either where the statute expressly so provides, or,

in the absence of an express provision, where the statute is a police power regulation declaring the unlicensed practice of the business or occupation to be illegal. See Annot., 82 A.L.R.2d 1429; 5 Am.Jur.2d Architects, § 4; 33 Am.Jur., Licenses, §§ 70, 71; 53 C.J.S., Licenses, § 59."

3. "Defendant has failed by a preponderance of the evidence to establish any breach of contract on the part of plaintiff."

4. "Defendant is not entitled to recover on its counterclaim."

Both parties now appeal.

Initially, we must note the limits of this court in reviewing cases tried before a judge sitting without a jury, as cogently expressed by the late Judge John B. Sanborn in Cleo Syrup Corp. v. Coca-Cola Co., 8 Cir., 1943, 139 F.2d 416, 417–418, 150 A.L.R. 1056, cert. denied, 321 U.S. 781, 64 S.Ct. 638, 88 L. Ed. 1074:

> "This Court, upon review, will not retry issues of fact or substitute its judgment with respect to such issues for that of the trial court. * * * The power of a trial court to decide doubtful issues of fact is not limited to deciding them correctly. * * * In a non-jury case, this Court may not set aside a finding of fact of a trial court unless there is no substantial evidence to sustain it, unless it is against the clear weight of the evidence, or unless it was induced by an erroneous view of the law." (Citations omitted.)

Accord, Parke-Davis & Co. v. Stromstodt, 8 Cir., 1969, 411 F.2d 1390. In determining whether there is a sufficient evidentiary basis for the trial court's findings of fact, we must view the evidence in the light most favorable to the prevailing party and give him the benefit of such favorable inferences as may reasonably be drawn therefrom. Burger Chef Systems, Inc. v. Govro, 8 Cir., 1969, 407 F.2d 921; Cleo Syrup Corp. v. Coca-Cola Co., supra, 139 F.2d at 418.

Applying the above principles and not finding the absence of substantial evidence or the inducement of an erroneous view of the law, we affirm the trial court's holding that Blue Ribbon has failed to establish any breach of the contract by Food Management.

The provisions of Iowa statutory law governing this appeal are similar to the architectural and engineering registration statutes of all fifty states, the District of Columbia, the Canal Zone, and Puerto Rico. Because of the importance of the precise statutory wording to the proper resolution of the various contentions made herein, we quote verbatim the relevant Iowa statutes.

Chapter 114 of the Iowa Code governs the practice of professional engineering and Chapter 118, the practice of architecture. Ia.C.A. § 114.1 provides as follows:

> "*114.1 Registered engineers and surveyors*
>
> "No person shall practice professional engineering or land surveying in the state unless he be a registered professional engineer or a registered land surveyor as provided in this chapter, except as permitted by the last section thereof."

Ia.C.A. § 118.15 provides:

> "*118.15 Unlawful practice*
>
> "It shall be unlawful for any person to practice or to offer to practice architecture in this state or use in connection with his name, or to otherwise assume, use or advertise any title or description tending to convey the impression that he is an architect unless such person is qualified by registration as herein provided."

The pertinent definitions are as follows:

> "*114.2 Terms defined*
>
> \* \* \* \* \* \*
>
> "The term 'professional engineer' as used in this chapter shall mean a person, who, by reason of his knowledge of mathematics, the physical sciences, and the principles of engineering, acquired by professional education

and/or practical experience, is qualified to engage in engineering practice as hereinafter defined.

"The practice of 'professional engineering' within the meaning and intent of this chapter includes any professional service, such as consultation, investigation, evaluation, planning, designing, or responsible supervision of construction in connection with structures, buildings, equipment, processes, works, or projects, wherein the public welfare, or the safeguarding of life, health or property is or may be concerned or involved, when such professional service requires the application of engineering principles and data.

 \* \* \* \* \* \*

"The term 'in responsible charge' as used in this chapter means having direct control of and personal supervision over any professional engineering work or land surveying work. One or more persons, jointly or severally, may be in responsible charge."

*"118.16 Definition*

"The practice of architecture includes any professional service, such as consultation, investigation, evaluation, planning, and design, or responsible supervision of construction, in connection with the construction of buildings, or related structures and projects, or the addition to or alteration thereof, wherein the safeguarding of life, health, or property is concerned or involved."

Ia.C.A. § 114.26 provides in part:

"Corporations engaged in designing buildings or works for public or private interests not their own shall be deemed to practice professional engineering within the meaning of this chapter [114]. With respect to such corporations all principal designing or constructing engineers shall hold certificates of registration hereunder. This chapter shall not apply to corporations engaged solely in constructing building and works."

Ia.C.A. § 118.17 states that Chapter 118 is not applicable to:

"1. Professional engineers registered under chapter 114.

"2. Persons acting under the instruction, control, or supervision of, and those executing the plans of, a registered architect or a professional engineer registered under chapter 114, provided that such unregistered persons shall not be placed in responsible charge of architectural or professional engineering work."

Ia.C.A. § 118.21, relating to the practice of architecture by a corporation, states in part as follows:

"Corporations may be formed under the provisions of the Iowa Business Corporation Act for the purpose of practicing architecture as herein defined. No corporation shall be eligible for registration under this chapter. A domestic or foreign corporation may practice architecture in this state, but only if all of the following requirements are met:

"1. *The entire practice of architecture by the corporation in this state and in connection with buildings, structures, and projects located in this state shall be done by or under the responsible supervision of an architect or architects qualified by registration as provided in this chapter."* (Emphasis supplied.)

Any person violating Chapter 114 may be permanently enjoined and the violation of such injunction is a misdemeanor. Ia.C.A. §§ 114.24, 114.25. Violation of Chapter 118 is also a misdemeanor. Ia.C.A. § 118.19.

 Food Management initially contends that it did not practice engineering or architecture in Iowa because its only contact with that state was the gathering of data. At first impression, cases such as Johnson v. Delane, 1955, 77 Idaho 172, 290 P.2d 213; Aero Service Corp. (Western) v. Benson, 1962, 84 Idaho 416, 374 P.2d 277; and Maxfield v. Bressler, Ohio App., 1942, 55 N.E.2d 424, support this contention. However, Ia.C.A. § 114.2 includes within the practice of professional engineering

"* * * *any* professional service, such as consultation, investigation, evaluation, planning, designing, or responsible supervision of construction * * * wherein the public welfare, or the safeguarding of life, health or property is or may be concerned or involved, * * *." (Emphasis supplied.)

Likewise, Ia.C.A. § 118.16 includes within the practice of architecture

"* * * *any* professional service, such as consultation, investigation, evaluation, planning, and design, or responsible supervision of construction, * * * wherein the safeguarding of life, health, or property is concerned or involved." (Emphasis supplied.)

Further, Ia.C.A. § 118.21 permits a foreign corporation to practice architecture in Iowa only if the *entire* practice in Iowa "and in connection with buildings, structures, and projects located in [Iowa] shall be done by or under the responsible supervision" of a registered architect. Thus, under Iowa law, the mere gathering of data constitutes a part of the practice of architecture or professional engineering. We also note that the data gathered in Iowa has relevance only when applied to the packing plant in Iowa. See Markus & Nocka v. Julian Goodrich Architects, Inc., Vt., 1969, 250 A.2d 739, 741.

▮▮ Food Management next contends that it did not practice engineering or architecture in Iowa because all such work actually performed in the state was by Johnson Jamerson Associates, registered engineers and architects. A literal interpretation of the terms of the general contract and subcontract, as set out herein, compels the conclusion that Johnson Jamerson was *not to perform* the entire architectural and engineering services, that it was not "in responsible charge" of the work, and that Food Management was not merely executing Johnson Jamerson's plans. See Oakason v. Lisbon Valley Uranium Co., D.Utah, 1957, 154 F.Supp. 692. Also, not find-

ing the absence of substantial evidence or the inducement of an erroneous view of law, we affirm the trial court's conclusion to this effect. Cleo Syrup Corp. v. Coca-Cola Co., supra.

▮▮ Food Management then contends that any architectural and engineering services it provided under the contract constituted an "isolated transaction" within the rationale of Dane v. Brown, 1 Cir., 1934, 70 F.2d 164. Accord, Johnson v. Delane, supra; Aero Service Corp. (Western) v. Benson, supra; Gaisford v. Neuschatz, 1967, Fla. App., 201 So.2d 635. We cannot agree. First, *Dane* involved a New Jersey statute which, unlike Ia.C.A. §§ 118.16 and 118.21, did not enumerate the supervision of construction as an architectural service and the court concluded that the statute was directed against engaging in or pursuing the profession of architecture, as opposed to a single isolated incident arising from unusual circumstances. Second, as we have noted, Iowa law includes within the practice of architecture and professional engineering "*any* professional service". Ia.C.A. §§ 114.2, 118.16. Third, a certificate may be granted without examination or residency requirement to anyone who has been certified by any authority outside of Iowa whose standards are not below those of Iowa. Ia.C.A. §§ 114.20, 118.8. Fourth, Ia.C.A. §§ 118.16 and 114.2 are explicit that the purpose of the registration statutes is to safeguard the public life, health and property and in Iowa State Board of Engineering Examiners v. Electronic Engineering Co., Iowa, 1967, 154 N.W.2d 737, 738, the Iowa Supreme Court stated:

"Like all licensing provisions, [Chapter 114] is designed to protect the public by making certain that one who undertakes to represent himself as a professional engineer and to offer his services as such will meet certain minimum standards."

One instance of untrained, unqualified, or unauthorized practice of architecture or professional engineering—be it an isolated transaction or one act in a con-

tinuing series of transactions—may be devastating to life, health or property. To exclude an isolated transaction from the proscription of the registration laws would seriously weaken the purpose of such laws at a point where their prohibition of professional services may be most needed. It is therefore clear to this court that the Iowa legislature intended to require registration as a prerequisite in all cases to the practice of engineering or architecture. We therefore agree with the obvious holding of the trial court that one instance of rendering unlicensed engineering or architectural services is sufficient to bring the actor within the ambit of the Iowa registration statutes. American Store Equipment & Construction Corp. v. Jack Dempsey's Punch Bowl, Inc., 1940, 174 Misc. 436, 21 N.Y.S.2d 117, aff'd 258 App.Div. 794, 16 N.Y.S.2d 702, appeal denied 258 App.Div. 876, 17 N.Y.S.2d 220, aff'd 283 N.Y. 601, 28 N.E.2d 23; Lindholm v. Mount, 1948, 163 Pa.Super. 36, 60 A.2d 422; Cantrell v. Perkins, 1941, 177 Tenn. 47, 146 S.W.2d 134; Markus & Nocka v. Julian Goodrich Architects, Inc., 1969, Vt., 250 A.2d 739; see, also, Mueller v. Burchfield, 1949, Mo.App., 218 S.W.2d 180, aff'd 359 Mo. 876, 224 S.W.2d 87, 13 A.L.R.2d 153.

We may summarily dispose of Food Management's remaining allegations concerning the applicability to it of Iowa's professional licensing laws. The engineering and architectural services rendered by Food Management were not merely incidental to the performance of the entire contract, as in Keller v. Baumgartner, 7 Cir., 1946, 153 F.2d 474. The public health, safety, and welfare were closely dependent upon the proper performance of the services under the contract. See Usdin v. Kvatinetz, N.Y. Sup.1947, 69 N.Y.S.2d 634; Smith v. American Packing & Provision Co., 1942, 102 Utah 351, 130 P.2d 951. The contract was not between licensed and unlicensed members of the same profession, as in Costello v. Schmidlin, 3 Cir., 1968, 404 F.2d 87, and Kennoy v. Graves, 1957, Ky.App., 300 S.W.2d 568.

Nor is this a situation where the architect or engineer approving the work or drawings was in the defendant's employ, as in Dick Weatherston's Associated Mechanical Services, Inc. v. Minnesota Mutual Life Ins. Co., 1960, 257 Minn. 184, 100 N.W.2d 819, 82 A.L.R.2d 1004, and Clement S. Crystal, Inc. v. Denberg, N.Y.Sup.1962, 237 N.Y.S.2d 102.

Having affirmed the holding of the trial court that Food Management practiced professional engineering and architecture in violation of the Iowa registration statutes, we now consider the effect of such violation of its claim for recovery of the balance alleged due it under the Peter Piper contract.

■ Architectural and professional engineering contracts which violate registration statutes are generally unenforceable. E.g., Oakason v. Lisbon Valley Uranium Co., supra, 1957, D.Utah, 154 F.Supp. 692; Southern Metal Treating Co. v. Goodner, 1960, 271 Ala. 510, 125 So.2d 268; Douglas v. Smulski, 1957, 20 Conn.Sup. 236, 131 A.2d 225; Dunn v. Finlayson, D.C.Mun.App., 1954, 104 A.2d 830; Johnson v. Delane, supra, 1955, 77 Idaho 172, 290 P.2d 213; Dick Weatherston's Associated Mechanical Services, Inc. v. Minnesota Mutual Life Ins. Co., supra, 1960, 257 Minn. 184, 100 N.W.2d 819, 82 A.L.R.2d 1004; Gionti v. Crown Motor Freight Co., 1942, 128 N.J.L. 407, 26 A.2d 282; American Store Equipment & Construction Corp. v. Jack Dempsey's Punch Bowl, Inc., supra, 1940, 174 Misc. 436, 21 N.Y.S.2d 117, aff'd 258 App.Div. 794, 16 N.Y.S.2d 702, appeal denied 258 App.Div. 876, 17 N.Y.S.2d 220, aff'd 283 N.Y. 601, 28 N.E.2d 23; Elephant Lumber Co. v. Johnson, 1964, 120 Ohio App. 266, 202 N.E.2d 189; Howarth v. Gilman, 1950, 365 Pa. 50, 73 A.2d 655; Cantrell v. Perkins, supra, 1941, 177 Tenn. 47, 146 S.W.2d 134; Mabry v. Priester, 1960, 161 Tex. 173, 338 S.W.2d 704; Markus & Nocka v. Julian Goodrich Architects, Inc., supra, Vt., 1969, 250 A.2d 739; Clark v. Moore, 1955, 196 Va. 878, 86 S.E.2d 37; Sherwood v. Wise, 1925, 132 Wash. 295, 232 P. 309, 42 A.L.R. 1219; contra, Robken v.

May, Nev., 1968, 442 P.2d 913; Maxfield v. Bressler, Ohio App., 1942, 55 N.E.2d 424; see, also, 6A Corbin on Contracts § 1512 (1962). As noted by the trial court in a footnote to its opinion, although the Iowa Supreme Court has not passed upon the enforceability of contracts contravening Iowa's present licensing statutes, it has recognized the general rule of unenforceability in Davis, Brody, Wisniewski v. Barrett, 1962, 253 Iowa 1178, 115 N.W.2d 839. See, Note, "Licenses—Contracts—Enforceability When in Violation of State Licensing Statutes", 48 Iowa L.Rev. 738. In *Davis*, the court held a contract for architectural services by an unlicensed architectural firm enforceable under the Iowa architectural registration statute which, *at that time*, prohibited only the use of the title "architect" and nowhere expressly indicated a legislative finding that anything in the performance of architectural services was inimical to the public health, safety and welfare. The court stated:

> "While by the enactment of Section 118.14, the legislature may have found the use of the title 'Architect', without a certificate, to be inimical to the comfort, safety, health and welfare of society, and thus be an exercise of the police power, it is not the function of the court to give to such exercise of police power an effect beyond that clearly intended by the legislature."
> 115 N.W.2d at 841.

Subsequent to *Davis*, and very probably as a result thereof, Ia.C.A. §§ 118.14 and 114.2 were amended, effective July 4, 1965, expressly pursuant to the police power to prohibit the unlicensed practice of architecture and professional engineering in Iowa. Also, since *Davis* and the statutory amendment, the Iowa Supreme Court has acknowledged that the legislative purpose of the licensing acts is to protect the public. Iowa State Board of Engineering Examiners v. Electronic Engineering Co., supra, Iowa, 1967, 154 N.W.2d 737. Therefore, in consideration of the general rule that contracts contravening architectural and professional engineering registration statutes are unenforceable, the distinction drawn by the Iowa Supreme Court in *Davis,* and the present language of these Iowa statutes as amended, we agree with the District Court that contracts entered into in violation of these Iowa laws are unenforceable.

Peter Piper, however, contracted for more than architectural and engineering services from Food Management. For example, Food Management negotiated for a captive slaughter arrangement for Peter Piper, compiled a control manual to provide standards for labor, materials and by-product yields, was to provide the shakedown operation of the plant, and was to initially manage the plant if trained personnel were not available. In fact, Food Management's charge of 8% for performance of the contract, as opposed to its regular architect's fee of 5–5½%, was to compensate for its additional services. In an attempt to harmonize the public policy of the registration statutes with the policy of the law to sustain contracts where to do so would work no violence, and in view of a court's natural aversion to unjust enrichment, we encounter no difficulty in concluding that the contract here is divisible into two parts—legal and illegal. The illegal portion of the contract relates to the architectural and engineering service which Food Management agreed to perform in violation of the Iowa registration statutes. The legal portion of the agreement relates to those services which are neither architectural nor engineering services.

Thus, we hold that Food Management is entitled to recover under the severable enforceable part of the contract for those services rendered to Peter Piper which were not violative of the Iowa registration statutes. See Oakason v. Lisbon Valley Uranium Co., supra, D. Utah, 1957, 154 F.Supp. 692; Carter v. Thompkins, 1956, 133 Colo. 279, 294 P. 2d 265; Montgomery v. East Ridgelawn Cemetery, 1947, 189 Misc. 99, 68 N.Y.S. 2d 836, aff'd 272 App.Div. 1048, 75 N. Y.S.2d 287; Industrial Installations

Corp. v. Sparer, N.Y.Sup., 1947, 74 N. Y.S.2d 198; 6A Corbin on Contracts § 1512 (1962); but see, American Store Equipment & Construction Corp. v. Jack Dempsey's Punch Bowl, Inc., supra; Gray v. Blau, Tex.Civ.App., 1949, 223 S. W.2d 53. Case No. 19,048 is therefore remanded to the District Court for a factual determination as to the recovery to which Food Management is entitled for the non-engineering and non-architectural services it performed under the contract. The District Court may, in its discretion, require an additional hearing to make this fact finding.

■■ It is the general rule that an oral cost limitation imposed upon an architectural or engineering design, where not contradictory to the express terms of the written contract, may be admitted into evidence. E.g., Almand v. Alexander, 1930, 180 Ark. 947, 23 S.W.2d 611; Crawford v. France, 1933, 219 Cal. 439, 27 P.2d 645; Spitz v. Brickhouse, 1954, 3 Ill.App.2d 536, 123 N.E.2d 117, 49 A. L.R.2d 673; Bair v. School Dist. No. 141, 1915, 94 Kan. 144, 146 P. 347; Rosenthal v. Gauthier, 1953, 224 La. 341, 69 So.2d 367; Wick v. Murphy, 1952, 237 Minn. 447, 54 N.W.2d 805; Keene v. Farris, 1934, Mo.App., 67 S.W.2d 526; Hite v. Aydlett, 1926, 192 N.C. 166, 134 S.E. 419; Keck v. Kavanaugh, 1920, 45 N.D. 81, 177 N.W. 99; Caldwell v. United Presbyterian Church, Ohio Com.Pl., 1961, 180 N.E.2d 638, 20 Ohio Op.2d 364, 88 Ohio Law Abst. 323; 3 Corbin on Contracts § 583 (1960). It is also the general rule that there may be no recovery for engineering or architectural services where the actual cost of the structure substantially or unreasonably exceeds the estimated cost limitation, unless the cost excess is attributable to the owner's action. E.g., Guirey, Srnka & Arnold, Architects v. City of Phoenix, 1969, 9 Ariz.App. 70, 449 P.2d 306; Rowell v. Crow, 1949, 93 Cal.App.2d 500, 209 P.2d 149; Cooper v. City of Derby, 1910, 83 Conn. 40, 75 A. 140; Lambright v. Everett, 1917, 21 Ga.App. 488, 94 S.E. 593; Stevens v. Fanning, 1965, 59 Ill.App.2d 285, 207 N.E.2d 136, 20 A.

L.R.3d 769; Bair v. School Dist. No. 141, supra; Rosenthal v. Gauthier, supra; Jay Dee Shoes, Inc. v. Ostroff, Md.App., 1948, 191 Md. 87, 59 A.2d 738; Schwender v. Schrafft, 1923, 246 Mass. 543, 141 N.E. 511; Zannoth v. Booth Radio Stations, Inc., 1952, 333 Mich. 233, 52 N.W.2d 678; Campbell v. Evens & Howard Sewer Pipe Co., 1956, Mo. App., 286 S.W.2d 399; Hite v. Aydlett, supra; Caldwell v. United Presbyterian Church, supra; Ballinger v. Howell Mfg. Co., 1962, 407 Pa. 319, 180 A.2d 555; Beacham v. Greenville County, 1950, 218 S.C. 181, 62 S.E.2d 92; Bueche v. Eickenroht, Tex.Civ.App., 1949, 220 S.W.2d 911; Parrish v. Tahtaras, 1957, 7 Utah 2d 87, 318 P.2d 642; Goodrich v. Lash, 1958, 121 Vt. 15, 146 A.2d 169. See, also, Clark v. Smith, 1940, 234 Wis. 138, 290 N.W. 592, 127 A.L.R. 406. The Iowa Supreme Court implicitly recognized this rule in Bowell v. Draper, 1910, 149 Iowa 725, 129 N.W. 54.

Blue Ribbon contends that prior to, at the time of, and subsequent to entering into the contract it imposed an oral limitation on Food Management with regard to the cost of the proposed packing plant. Although the trial court admitted parol evidence bearing on the question of cost limitation, it did not make a specific finding as to whether or not such a condition was imposed upon Food Management. However, implicit in the court's holding, which we have affirmed, that Blue Ribbon had failed to establish any breach of contract by Food Management is the finding that there was no cost limitation or, if there was, it was either not exceeded by Food Management or was waived by Blue Ribbon. On this basis, and because we have held that Food Management cannot recover the balance alleged due them for engineering and architectural services, it is unnecessary for us to further consider Blue Ribbon's contention on this point.

■ We now turn to Blue Ribbon's counterclaim seeking restitution of the $24,000 it paid to Food Management prior to termination of the contract.

There is no provision under the Iowa registration statutes for the recovery back of money voluntarily paid under an architectural or engineering contract to an unlicensed party. To allow both retainment of services and recovery back of money paid is not necessary to effectuate the public policy of the licensing statutes, and there would be no inequitable harm to Blue Ribbon in not invoking restitution because, as found by the trial court, it obtained the service it had bargained for. We therefore affirm the District Court's denial of Blue Ribbon's counterclaim. See Comet Theatre Enterprises, Inc. v. Cartwright, 9 Cir., 1952, 195 F.2d 80, 30 A.L.R.2d 1229.

The judgment of the District Court in case No. 19,072 is in all things affirmed. Case No. 19,048 is remanded to the District Court for proceedings consistent with this opinion.